## NATIONAL LABOR RELATIONS BOARD v. POULTRYMEN'S SERVICE CORPORATION.

### No. 8347.

Circuit Court of Appeals, Third Circuit.
Argued July 9, 1943.
Decided Sept. 28, 1943.

L. N. D. Wells, Jr., N. L. R. B., of Washington, D. C. (Robert B. Watts, General Counsel, Ernest A. Gross, Associate General Counsel, Howard Lichtenstein, Asst. General Counsel, and Owsley Vose and Ralph Winkler, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Floyd H. Bradley, Camden, N. J., and David A. Veeder, Toms River, N. J. (French, Richards & Bradley, of Camden, N. J., on the brief), for respondent.

Before BIGGS, JONES, and DOBIE, Circuit Judges.

BIGGS, Circuit Judge.

The respondent has a mill at Toms River in Ocean County, New Jersey. From 1930 to 1940, inclusive, its employees, including executives, office employees, salesmen, mill hands and truck operators varied in number from eleven to thirty. The respondent mills, mixes, bags, retails and distributes poultry and dairy feed wholly within the State of New Jersey. None of its finished products has ever been sold outside of New Jersey. It purchases its raw materials (grains) in States other than New Jersey. In 1940, for example, the respondent bought over 533,000 bushels of grains of a value in excess of $390,000.

The respondent takes the position that it is not engaged in interstate commerce and therefore is not subject to the jurisdiction of the Board. It sells its finished products in intrastate commerce and alleges that a curtailment of its operations by reason of any unfair labor practices upon its part (which it denies have occurred) will not "affect" the flow of interstate commerce within the purview of Sections 1 and 10 of the National Labor Relations Act, 29 U.S.C.A. §§ 151 and 160. The facts of National Labor Relations Board v. Suburban Lumber Co., 3 Cir., 121 F.2d 829, 831–833, certiorari denied 314 U.S. 693, 62 S.Ct. 364, 86 L.Ed. 555, are very close to those of the case at bar, though as the respondent points out, in that case Suburban Lumber Company did deliver a very small portion of the company's finished products to points outside of New Jersey. The case is on all fours, however, with the decision of this court in National Labor Relations Board v. Kudile, 3 Cir., 130 F.2d 615, certiorari denied 317 U.S. 694, 63 S.Ct. 436, 87 L.Ed. —. What we said in the Kudile case need not be repeated here. We hold, therefore, that the Board had jurisdiction of the respondent.

The Board found that the respondent violated Section 8(1) of the Act, 29 U.S.C.A. §

158(1), by interfering with the right of its employees as to organization and collective bargaining; violated Section 8(5) of the Act, 29 U.S.C.A. § 158(5), by refusing to bargain collectively with United Cannery, Agricultural, Packing and Allied Workers of America, a union affiliated with the Congress of Industrial Organizations; and violated Section 8(3) of the Act, 29 U.S.C.A. § 158(3), by refusing to reinstate a group of employees who had gone out on strike because of the respondent's allegedly illegal refusal to bargain with the union.[1] We shall discuss these charges and the proof offered in support of them together, since many of the facts relate to one or more of the charges.

Leonard Goldsmith, a CIO representative, began to organize the respondent's employees in September, 1940. By September 28th about twenty-five of them had joined the union. This was a large majority. On September 29th a shop committee was elected at an organization meeting and on September 30th Goldsmith wrote a letter to Harry K. Bisbee, the president of the respondent and stated that the union had been designated by a majority of the employees as their collective bargaining agent. Goldsmith's letter also included the statement that he would like to arrange for an appointment with Bisbee for the purpose of negotiating a contract to cover wages, hours, and working conditions of the employees. Goldsmith suggested Friday, October 4th as a meeting day. Bisbee replied to this letter on October 2d, stating in part, "I would like to state for your information that we have a committee representing our employees that meet with the management from time to time and up to this date no request has been made that has not been carefully considered and satisfactory arrangements made. Therefore, it would be a waste of your time as well as the writer's to arrange for an appointment." The statement of the letter that a committee of employees had met with the management from time to time to resolve grievances was not correct. Upon the receipt of Bisbee's letter, Goldsmith telephoned to him and asked again for a meeting. Bisbee refused to meet Goldsmith. When Goldsmith threatened a strike Bisbee said "Go ahead". This constituted the respondent's first refusal to bargain collectively with the union.

A strike followed immediately, which resulted in a complete walk-out at the respondent's plant. On the following day, October 4th, a meeting was held between Bisbee, the plant manager, Leet, the chairman of the board of directors, David Veeder, an attorney representing the company, and another director. The union was represented by three members of the shop committee, including Huhn, the chairman, and Collins, Gatch, and Goldsmith. A temporary written agreement was immediately executed providing for a truce to terminate on October 20th. The agreement also provided, among other things, for immediate recognition of the union grievance committee, establishment of a seniority list, promotions upon the basis of seniority and for the commencement of negotiations. The strikers returned to work within a few hours after the conclusion of the temporary agreement on October 4th. Veeder was designated by the respondent's board of directors to represent the respondent in negotiations with the union.

Negotiations did in fact take place. But on October 7th Veeder prepared and distributed to the stockholders a notice of a special meeting of stockholders to be held on October 18th. The notice is long and its contents need not be repeated here. It set before the stockholders four possible courses. One of these was the recognition of the union; the second and third proposals provided for a dissolution of the corporation. The fourth posed the question, "Shall we refuse to recognize the Union and call upon the law to protect us, and resume business on whatever reduced scale we may find necessary?" The notice also stated, "It may be that our period of usefulness is over. War preparedness is being taken advantage of by some labor agitators to create unrest. Labor trouble may be a serious factor in the future. If our company is dissolved now, what assets we have will be available for distribution among the stockholders." The Board found the "tone and content" of this notice to be obviously anti-union. This conclusion is justified.

---

[1] The Board ordered the respondent to cease and desist from the unfair labor practices which the Board found it had committed; to bargain collectively, upon request, with the union; to offer reinstatement or placement upon a preferential list to all strikers who had not already been reinstated; to make all strikers whole, including those already reinstated, for losses of compensation; and to post appropriate notices.

Three of the four proposals indicate that Veeder was contemplating a course of conduct which did not include negotiation of a contract with the union, despite the fact that the temporary written agreement signed by the respondent expressly provided that "The Company agrees to commence negotiations on a contract between the Company and the Union covering wages, hours, and working conditions on Monday, October 7, 1940, and such negotiations [are] to proceed without delay." The respondent, therefore, putting the very best light upon its conduct, was of a divided mind. It would negotiate with the union or it would not negotiate with the union but would dissolve. Viewing the facts in a less favorable light, one might reach the conclusion that the respondent did not intend to negotiate with the union and made the temporary agreement solely in order to relieve itself of a difficult position and get its employees back to work.

On October 4th, Goldsmith had submitted proposals for a permanent agreement. These were examined by Veeder who told Goldsmith that the demands for wage increases were too high and that the company's profits and financial structure could not possibly justify any such wages as were demanded in the proposal. It appears that Goldsmith then said to him, "We are not unreasonable. We don't expect you to pay more than your earnings and financial structure would permit." Veeder then said to Goldsmith, "If that is the case we ought not to have any difficulty in getting together * * *". Veeder offered to have a statement of the respondent's earnings prepared for the union's information. This statement was sent to Goldsmith with a letter dated October 11th in which Veeder made the following statement, "I am finding it most difficult to draft any counter-proposal which will in any substantial measure meet your demands and which we will at the same time have a reasonable chance of having accepted by the stockholders of this Company." On October 14th Veeder did submit a counterproposal which made no provision for an increase in wages, but which did provide for a union shop and certain other rights.

The union representatives contended that "this was not collective bargaining", that the board of directors had power to act in respect to the union's demands and that the letter to the stockholders indicated that the respondent was not acting in good faith.

The Board found as a fact that the company's attorney, Ewart, took the position that the respondent did not have to bargain with the union because it was not engaged in interstate commerce. According to Goldsmith "the conference broke up when Judge Veeder informed us that there were no wage increases in the wind at all".

As we have stated, Veeder had submitted to the union on behalf of the respondent counterproposals which among other things provided for a union shop, seniority rights and union grievance machinery, but none the less when the stockholders met they adopted a resolution, apparently prepared by Veeder, in which the stockholders "unconditionally rejected" the proposals for a union shop, seniority security, consultation with union representatives on discharges, and other proposals. The resolution also provided, "Be it further resolved that it is the sense of this meeting of stockholders that a fair and living wage should be paid to its employees consistent with its earnings and financial structure, and the Board of Directors be and they are hereby instructed to work out a fair and equitable arrangement with such of its men as may return to work by Monday morning next at 8 A. M." The resolution also provided that the officers should be instructed to make every reasonable effort to keep the mill in operation but that if every effort made to that end should prove unavailing that the company should dissolve forthwith.

The stockholders' resolution does not refuse in express words to bargain with the union, but the refusal to grant a union shop, seniority and job security provisions, coupled with the threat of dissolution of the company and the instruction to officers to "work out", i. e., to negotiate an arrangement with such men as returned to work on the following Monday, would seem to us to justify a conclusion that the respondent did not intend to negotiate further with the union. Since recognition of the union is an essential of collective bargaining, refusal to acknowledge the union vitiated the sincerity of any negotiations by the company. National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 715; McQuay-Norris Mfg. Co. v. National Labor Relations Board, 7 Cir., 116 F.2d 748, 751. It is probably the case as Veeder stated that he would have been able to have mitigated the effect of the rejection by the stockholders of some of the provisions which the

union desired, but while bargaining in a labor dispute can and must be conducted at arm's length, it must be conducted in good faith: National Labor Relations Board v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32, 37. We think there is definite evidence in the conduct of the respondent's bargaining representatives that the real purpose of the stockholders' resolution was to discourage the respondent's employees with the efforts of the union on their behalf and to enable the officers of the company to negotiate a contract with an association comprised of its own employees and not affiliated with an outside union.

Strong support is given to this view by the actions, on the morning after the stockholders' meeting, of Page, a stockholder of the respondent, and Hecht, one of the respondent's contract truckers and the brother of one of its directors. These two men went into the plant on Monday and informed the employees that the respondent would not deal with the CIO. They both indicated the belief that the employees would be best served by a company union. The shop committee felt some doubt as to whether or not Page and Hecht possessed authority to represent the respondent. Page thereupon talked to Leet, the plant manager, who indicated according to Page's testimony, that he was willing that Page might be put in a position "whereby the boys would deal with the company".[2] Thereafter Veeder gave a copy of the stockholders' resolution to Huhn, chairman of the shop committee, and stated according to Huhn's testimony that he, Veeder, "could not act outside of the scope of this resolution". Huhn also testified that at this meeting he told Veeder that he would consult the men and inform him, Veeder, whether the employees would form a company union or "stay with the CIO". A meeting of the employees was held later that same day. Huhn believed (according to his testimony both Page and Leet had told him so) that the respondent had "about 60 men" ready to take the plac-

es of any employees who should strike. The employees accepted the suggestion of Leet and Page and proceeded to negotiate independently of the union. Apparently at the suggestion of one of these men they hired an attorney, Edward W. Haines, for the purpose of representing them.

On the evening of October 19th the employees met at the plant with Leet, Page and Haines. Haines testified as follows, "Mr. Leet stated at the very beginning [of the meeting] that the company would not do business with the CIO, that the CIO was out so far as the company was concerned and that the company would go into dissolution and liquidate before they would do business or bargain with the CIO, and said that the only basis upon which an employment contract would be made would be upon the basis of a company union." Negotiations then proceeded, apparently upon the theory that the shop committee was negotiating without connection with the CIO. Leet agreed to a 15% increase in wages and made other concessions. The negotiators were unable to complete their discussions on the evening of October 19th and they thereupon executed an agreement extending the term of the temporary agreement of October 4th from October 20th to October 26th. This agreement was signed by Leet as manager and by Page as a representative. On the following morning Huhn informed Veeder of the meeting which had been held on the evening of the 19th and the execution of the extension agreement. Veeder said nothing which indicated that he felt that Leet and Page had no authority to act for the respondent.[3]

On October 21st when the employees left the plant Hess, a union representative, persuaded them that they should not negotiate through a company union. Negotiations then began inside the plant at a meeting between the shop committee, Haines, Hess, Veeder, Bisbee and Leet. According to Haines' testimony Veeder did not wish Hess to be present and said so, but Hess none the less entered the

---

[2] The testimony is as follows:

"Q. What did Mr. Leet say?— A. He said that he was willing.

"Trial Examiner Paradise. Willing to do what?

"The witness. That I would be put in a position whereby the boys would deal with the company."

[3] The respondent has devoted a portion

of its brief to the citation of New Jersey authorities in an attempt to prove that Leet and Page had no authority to act for the corporation. The authorities cited are quite beside the point. Leet, as manager, certainly had the authority to negotiate, and what Page did seems to have met with the approval of the company.

plant. Veeder gave Haines a copy of the stockholders' resolution and informed him, according to Haines' testimony, "We are bound by the terms of that resolution and so far as a union is concerned of any kind we will not recognize it. This resolution is our law."[4] Hess and the shop committee left the conference and informed the employees of what had taken place. The employees voted unanimously to strike. There is testimony to the effect that shortly thereafter Page came out of the plant and told the employees, assertedly at Veeder's direction, that other persons would be put in their jobs if they did not return to work within ten minutes. The strike then took place and a picket line was established.

On October 27th there was a further meeting, at the suggestion of some of the respondent's customers, between the shop committee, Haines and Dahl, a general officer of the CIO. The shop committee indicated modification of its demands, suggested that possibly a 15% increase in wages would be acceptable, but insisted upon a union shop, seniority and job security provisions. Veeder refused to agree to these provisions, stating again that he was bound by the stockholders' resolution. In a letter dated October 28th to Haines, Veeder stated, inter alia, "While the striking men do not appear to realize it I know that you appreciate that the present authority of the Board of Directors is limited by the terms of the resolution passed by the stockholders." He stated also, "Assuming that we can at once work out an acceptable formula to be submitted to the stockholders' meeting to be called as soon as our by-laws will permit, the present management will do so only on condition that in the interval the Union will agree to refrain from continuing its boycott, that is, its endeavor to induce our customers to refrain from buying feed from us, and that they will likewise refrain from any threats, show of force, or any act of intimidation whatever to any of our employees or customers and with the picket line reduced so that it will not interfere with business." He also discussed in the letter certain demands of the union and stated that every member of the board of directors was adamant on the first point, viz., a refusal to allow office employees " * * * who are assistants to our executives and with full access to our records and confidential information, be incorporated into the union." He stated categorically that the respondent would go out of business before acceding to that demand.

In a statement which was published on November 1st, the respondent gave a factually incorrect statement of its dealings with the union. The respondent stated inter alia that it had agreed to grant a 15% increase in wages. It had indeed offered a 15% increase in wages to the employees through the medium of the shop committee which it thought had been detached from the union. The offer was not made to the employees through the medium of the union. This should be contrasted with the contention now made that Leet was without authority to negotiate for the respondent. The published statement also accused the strikers of receiving support from certain "Communistic elements in this community." There is no evidence in the record before us which supports such a statement.

On November 6, 1940, and thereafter from time to time the shop committee and representatives of the union met with Veeder, Leet and others representing the respondent. The union insisted on the reinstatement of all strikers which would have required the discharge of newly hired employees. The respondent refused, taking the position that it owed nothing to the strikers and that it could not and would not recognize the union as the representatives of its employees. Subsequently the respondent did offer to reinstate a few of the strikers and to make cash settlements with those not reinstated, but it took the position that any strikers who returned to their positions would do so as new employees. According to the testimony of Dahl, Veeder stated that certain men

4 Counsel for the respondent has suggested to the court that the word "shop" should be inserted after the word "union", but the context of the testimony of which the quotation is a part does not bear out the suggestion. Haines testified that he asked Veeder, "Do you realize that you are making a strike in your plant necessary because by the terms of your resolution these employees would have no protection whatsoever in the event they continued work?" Haines states that Veeder replied, "I am still bound by the terms of that resolution." Veeder also stated that Leet and Page had had no authority to negotiate for the respondent.

210

who had gone on strike would never go back to work for the respondent. The respondent refused to retreat from its position that it would not discharge new employees in order that strikers might be reinstated.

The financial resources of the striking employees were coming to an end. Haines testified, "I believe that some of them were given chickens and eggs by farmers, but other than that I don't think they had any resources, and in January—about January 8, 1941, the striking employees were in very bad financial straits." Previously a trial examiner for the Unemployment Compensation Commission had ruled that the strikers were entitled to compensation but this relief apparently was not forthcoming by early January, 1941.

On January 7, 1941, twenty-four of the striking employees designated Miller as their representative for collective bargaining and on January 8th an agreement settling the strike was negotiated. The agreement did not provide that the union should be recognized and specifically it did not provide that the respondent should employ any of the strikers. It represented a complete surrender of almost every right which Congress has seen fit to give a working man under the National Labor Relations Act. It represents as complete a negation of the terms of that statute as we have encountered. It is notable that though the contract did preserve the rights which the employees had to continue suits brought against the respondent under the Fair Labor Standards Act of 1938, June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., and specifically provided that the respondent should not try to compel any of its employees to discontinue such suits, there is evidence that the respondent none the less threatened to discharge two strikers who had been reemployed by it unless suits which they had started under the Fair Labor Standards Act were discontinued.

■ On the record before us we conclude that there was most substantial evidence to support the finding of the Board that the respondent was guilty of the unfair labor practices charged including refusal to bargain collectively with the union.

■ Since the strike was caused by the unfair labor practices of the respondent,

the Board is authorized in its discretion to order that striking employees be reinstated with back pay. See § 10(c) of the National Labor Relations Act, 29 U.S.C. A. § 160(c), and National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533. The respondent contends that that portion of the Board's order dealing with back pay should not run from November 6, 1940 because on that day the respondent offered to reemploy many of the strikers. The union requested the reinstatement of the strikers in a body. This request was denied. The respondent's counter offer was discriminatory since it was not made to all the strikers. Furthermore, the respondent refused to restore seniority status to those workers whom it was willing to rehire. Such an offer does not comply with the requirements of the Act. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 48, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Mackay Radio & Tel. Co., 304 U.S. 333, 347, 348, 58 S.Ct. 904, 82 L. Ed. 1381.

The Board's denial of the respondent's application for rehearing and for modification of the decision and order was justified. We will deal with the seven points raised by the respondent in the sub-paragraphs which follow.

■ (1) The respondent objects to the terms of the order requiring reinstatement and back pay to Edna Stewart, because the Board has found that as the respondent's secretary who might have access to confidential information pertaining directly to the labor relations of the respondent, she may not be included in the collective bargaining unit. The respondent seems to contend that because she is excluded from the unit, she is not entitled to reinstatement and back pay. This is not the case. The exclusion does not deprive her of the benefits of the Act.

■ (2) The respondent also objects to the inclusion of three other office employees in the bargaining unit on the ground that their work will give them access to confidential company information.[5] The Board found that the nature of their duties did not give them access to confidential information with respect to labor relations and that, therefore, they were prop-

[5] It should be observed that the respondent did not press this point before the trial examiner. See testimony of Ewart, p. 78 of petitioner's appendix.

erly included in the unit. The test which the Board lays down is sound. Possession of confidential information is of itself insufficient to justify deprivation of the right to collective bargaining. See Matter of Warner Bros. Pictures, Inc., et al., 35 N.L.R.B. p. 739; In re Creamery Package Manufacturing Company, 34 N.L.R.B. p. 108.

(3) The respondent objects to that portion of the order requiring back pay to be paid by the respondent from November 6, 1940. This contention has been discussed in the last preceding main paragraph. As we indicated there, it is without merit.

(4) The respondent objects to that part of the order which requires the payment of back pay to an employee who operated a berry and poultry farm after he left the respondent's employment. The Board's order makes plain, however, that it will require the amount earned by any employee in another employment to be deducted from the sum which the respondent is to be required to pay him by way of back pay. The objection, therefore, must fall.

(5) The respondent also contends that it is not required to make whole three employees (Frank Johnson, Carson Cornelius and Melvin Johnson), who, says the respondent, absented themselves from work, not as strikers, but because they feared violence at the hands of the strikers and that Cornelius was employed by the respondent at a different job during the period from November 5th until November 14th, 1940. On the day last mentioned the employees resumed their regular work at the respondent's plant. We are unable to find anything in the record which supports the contention of the respondent that the three men left their employment because of fear of violence. So far as the record shows their status is the same as that of the other employees whose reinstatement the Board requires. We, therefore, are not required to pass upon the point raised by the respondent as to the status of employees who fear violence at the hands of strikers. The fact that Cornelius was employed by the respondent at another job for a period of nine days will be taken into account by the Board under the terms of its order when the amount of back pay owed to him is calculated. There is no error here.

(6) The respondent also objects to that portion of the order requiring the reinstatement of any of the strikers, because it asserts that on January 8th, 1941 it offered reinstatement to any of them who desired to return to work and that this offer was refused by the strikers. The respondent, however, as we have stated, did not make a full and fair offer of reinstatement to the strikers on this date. The agreement executed on January 8th, 1941 was, as we have indicated, an almost complete negation of the rights to which the respondent's employees were entitled under the National Labor Relations Act. The Supreme Court has held in National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 364, 60 S.Ct. 569, 84 L.Ed. 799 that an employee cannot contract himself out of his rights under the Act.

(7) The respondent objects to the designation of the CIO union as the collective bargaining agent for its employees because, as it points out, its present employees are not members of the union. The respondent cannot force its employees out on strike, hire strike breakers to fill their places, and then be heard to assert that the union which a majority of its employees had selected as their representative for collective bargaining is no longer a legal representative. Such an interpretation would permit an employer to flout with impunity the provisions of the Act.

The order of the Board will be enforced.