NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ARMSTRONG TIRE AND RUBBER
COMPANY, TIRE TEST FLEET
BRANCH, Respondent.

No. 15635.

United States Court of Appeals
Fifth Circuit.

Feb. 19, 1959.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Owsley Vose, Atty., N.L.R.B., Washington, D. C., for petitioner.

F. A. Kullman, Richard C. Keenan, Kullman & Lang, New Orleans, La., for respondent.

Sam Houston Clinton, Jr., Austin, Tex., for intervenor.

Before HUTCHESON, Chief Judge, and RIVES and JONES, Circuit Judges.

HUTCHESON, Chief Judge.

While ordinarily a motion of the kind here involved would be disposed of on the motion papers and without oral argument, we set the motion for hearing because of the insistence of the respondent, (1) that the order was entered in violation of a settlement entered into between respondent and the Regional Office of the Board, which was a bar to further proceedings in determination of back pay, and (2) that if the settlement was not a bar, the Board, in determining back pay had erred in taking into consideration periods of time rejected by the examiner.

Because of these contentions and the urgency with which they were pressed, we granted the request of the respondent for a hearing and, the issues having been heard on briefs and argument, the matter is before us for decision.

On January 19, 1956, this court enforced an order of the Board, made Feb. 18, 1955, which directed, among other things, that respondent make whole Edwin A. Albrecht, its employee, for any loss of pay he may have suffered because of his illegal discharge. (228 F.2d 159.)

On April 10, 1956, an enforcement attorney in the Board's Fort Worth Regional Office wrote respondent that the Regional Office's computation showed the sum of $5,736.00 to be due Albrecht. The attorney added that because of some doubt whether Albrecht had made a reasonable effort to find employment during an 11 month period, the Regional Office was prepared to settle for half the total net back pay, of $2,868.00. On May 20, 1956, respondent made a counter offer of $349.26. After further negotiations, another attorney in the Regional Office wrote respondent on October 29, 1956, suggesting a "compromise settlement" for the sum of $336.29. On November 2, 1956, respondent sent the Chief Law Officer its check for $232.12, which, plus Social Security and withholding tax, made up the said sum of $336.29. The check now is in the possession of Albrecht or his attorney. At no time did the Board approve this "compromise settlement".

On November 9, 1956, in a document served on all parties, Albrecht appealed to both the General Counsel and the Board to rescind the Regional Director's arrangement. The General Counsel, in effect granting Albrecht's appeal, referred the matter back to the Regional Director for the purpose of holding a formal proceeding to determine the amount of back pay due Albrecht.

Thereafter the Regional Director issued a back pay specification. Proceedings before a trial examiner of the Board followed, culminating in an intermediate report of the examiner, followed by the Board's decision and order now before the Court. In this decision, the Board determined that Albrecht's net wage loss from August 10, 1953 (the effective date of respondent's discrimination against him) to January 3, 1956 (when respondent reinstated him) amounted to $5,586.-38, after crediting respondent with Albrecht's net earnings of $3,024.86. In so deciding, the Board rejected contentions of respondent that it had validly

settled the matter with a representative of its Regional Office for the sum of $336.28, that no back pay should be awarded because of Albrecht's alleged "unreliability" as a witness, that deductions should have been allowed for alleged wilfully incurred losses, and that in any event Albrecht should be denied back pay for that portion of the interim or back pay period in which he was self-employed.

■ The respondent, the Board, and the intervenor, Albrecht, have fully and thoroughly stated their views on the issues presented, and, as thus crystallized, the differences· between them stand out clearly. As a result, we are left in no doubt as to what our conclusion should be on the settlement issue. This is that respondent's contention that it fully discharged its liability for back pay due Albrecht under an arrangement with the Board's Regional Office pursuant to which it sent its check to Albrecht for $336.28, a fraction of the sum of $5,586.-38, which the Board found to be due, is without sound basis in law and in fact. It is without sound basis in law because, though the Act vests in the Board itself the sole authority to determine the amount of back pay due an employee who has been discriminated against in violation of Sec. 8(a)(3) of the Act, 29 U.S. C.A. § 158(a)(3), and this authority has not been and could not validly be delegated to subordinates so as to bind the Board in circumstances of this kind, the settlement was not approved by or even presented to the Board for approval. It is without sound basis in fact because, while the proceedings were gone through as stated, they were, as the trial examiner and the Board found, merely prelim-

inary negotiations which had not culminated in a binding settlement.

Without laboring the matter further, it is sufficient to say that we are in no doubt that the Board is correct in its position and determination that it would be in complete frustration of the purposes and objects of the Act to allow what went on in this case to operate as a binding settlement.[1]

■ Because of these views, it follows as matter of course that the doctrine of equitable estoppel here fails, both in law and in fact. It fails in law because respondent is charged with knowledge of the Board's powers and functions and, therefore, of the limitations placed by law upon the authority and actions of its subordinates. It fails in fact because there is no equity in the claim, that a liability imposed upon the respondent because of its wrong doing of the nature and proportions found by both examiner and Board can be discharged by the small payment here claimed to have that effect, none in the claim that the regulations relied on could form the basis of an estoppel against the Board.[2]

■ On the second issue, the amount of back pay which should be awarded, respondent finds support in the intermediate report of the examiner and the view of one member of the Board to the extent that the examiner found that the time during a part of which Albrecht helped his wife with her ice business, August 10, 1953, to March 22, 1955, should be excluded from the back pay period. Basing this conclusion upon the evidence set out and discussed at length in his report, that Albrecht did not during that period make reasonably diligent efforts to seek employment and that the

1. Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61·S.Ct. 845, 85 L.Ed. 1271; N. L. R. B. v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377; N. L. R. B. v. New York Merchandise Co., 2 Cir., 134 F.2d 949; N. L. R. B. v. Pool.Mfg. Co., 339 U.S. 577, 70 S.Ct. 830, 94 L.Ed. 1077; N. L. R. B. v. General Motors Corp., 2 Cir., 179 F.2d 221; Krug v. Lincoln National Life Ins. Co., 5 Cir., 245 F.2d 848.

2. N. L. R. B. v. T. W. Phillips, 3 Cir., 141 F.2d 304; N. L. R. B. v. Lake Superior Lumber Corp., 6 Cir., 167 F.2d 147; Middlesboro Liquor & Wine Co. v. Berkshire, 77 U.S.App.D.C. 88, 133 F.2d 39;· United States v. Holley, 5 Cir., 199 F.2d 575; United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050.

work at his wife's icehouse was not really self employment within the rule, the examiner fixed the amount due for the period after that time until reinstatement at $1935.24.

The Board, in its determination of the amount of back pay, disregarding the examiner's opportunity to judge of and determine Albrecht's credibility and the weight to be given his testimony, took precise issue with and rejected the conclusion of the examiner that Albrecht should receive no back pay for the period from August 10, 1953, until March 22, 1955.

Urging upon us that it has consistently held with court approval that, unless unusual circumstances exist, a discriminatee, who devotes his *full time* to self employment and does not seek other employment, is entitled to back pay, the amount to be computed by deducting his net profits from his gross back pay, the Board, notwithstanding (1) that the icehouse business was his wife's, (2) that Albrecht testified that it was only for the first six months that he devoted full time to the icehouse, and (3) the other facts detailed by the examiner, the Board takes issue with the examiner that this is not a case of very unusual circumstances awarding a departure from the rule the Board invokes. While, therefore, accepting the examiner's findings for the periods for which he allowed recovery, the Board, citing N.L.R.B. v. Cashman Auto. Co., 1 Cir., 223 F.2d 832; N.L.R.B. v. Poultrymen's Service Corp., 3 Cir., 138 F.2d 204; N.L.R.B. v. Efco Mfg., 1 Cir., 227 F.2d 675; and Board cases such as Brotherhood of Painters, etc., 114 N.L.R.B. 295, allowed Albrecht additional recovery for the full elapsed time between his discharge and reinstatement, and reached the conclusion that the total net back pay to be awarded was $5586.38.

█ We find ourselves in agreement not with the Board but with the examiner. This is so because, we think the Board's conclusion to the contrary arises from a misapprehension or misjudgment of the proven facts and the unpermissible application to them of the principle invoked by the Board. This is that *bona fide full self employment* will be regarded as complying with the obligation imposed upon a discharged employee to use reasonable diligence to keep himself in gainful employment and thus discharge his obligation of minimizing or mitigating his damages instead of failing to do so and looking to the employer to make good his self imposed losses.

█ This is the real, the only, reason underlying the rule, that an employee who has been wrongfully discharged may not fail to seek employment with reasonable diligence and thereby increase the amounts to be paid to him as back pay. While the rule does not require effectiveness in seeking and obtaining work, it does require of the employee a good faith and diligent effort to obtain other employment and thus minimize his damages and the injury to him and the public from self imposed abstention from gainful employment. Pointing out that to be entitled to back pay an employee ordered reinstated because of wrongful discharge must exercise due diligence in mitigating his losses, the respondent, quoting from Phelps Dodge Corp., supra, [313 U.S. 177, 61 S.Ct. 854]. "Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred", insists that wilful losses are within the meaning of the decisions incurred if due diligence is not exercised in seeking gainful employment.[3]

Giving full effect to the arguments made and authorities cited by the Board, we think it clear, for the reasons stated by the examiner in his report, that it is not the examiner and the dissenting

3. N. L. R. B. v. Pugh & Barr, 4 Cir., 207 F.2d 409; N. L. R. B. v. Moss Planing Mill Co., 4 Cir., 224 F.2d 702; N. L. R. B. v. Southern Silk Mills, Inc., 6 Cir., 242 F.2d 697; N. L. R. B. v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377.

member of the Board who have misapprehended the facts and misapplied the law, it is the Board. As the examiner found and the record reflects,[4] the facts as to the icehouse business and Albrecht's failure to exercise diligence to secure employment are such we think as to put beyond question that the Board's conclusion that Albrecht's conduct in that period measured up to the standards of diligence and good faith entitling him to make claim for back wages for that period is without substantial evidentiary support, indeed is contrary to the evidence. The back pay order of the Board is therefore modified to conform it to the amount found by the examiner, $1935.24, and, as so modified, it is enforced.

Modified and enforced.

RIVES, Circuit Judge (concurring in part and dissenting in part).

I concur as to all except the second issue concerning the amount of back pay, as to which I respectfully dissent. My brothers, in agreeing with the trial examiner and the dissenting member of the Board that the time during which Albrecht helped his wife in their ice business (August 10, 1953 to March 22, 1955) should be excluded from the back

---

4. Albrecht and his wife purchase a lot, apparently in 1952, upon which he constructed a building and in the latter part of December, 1952, opened a drive-in store, selling groceries, beer, soft drinks, and ice. While Albrecht's wife did not contribute any money towards the purchase price or the cost of the building, or the stocking thereof, he stated they "bought it together" and "worked the place together". Neither Albrecht nor his wife drew any salary from the business but the building was used as a combination store and home for the family and they "lived off the business." While employed by the company, Albrecht worked a 5-day week, Monday through Friday, on alternating shifts running from 6 A.M. to 2 P.M., from 2 to 10 P.M., and from 10 to 6 A.M. In this period Albrecht worked at the ice house on his off hours, which was open from 10 A.M. to 10 P.M., 7 days a week. At all times he and his wife ran the business, except for occasional part time help of 1 or 2 customers who worked off their bills, and following his discharge the business was open from 8 A.M. to 11 P.M., 7 days a week.

In the period following his discharge, Albrecht could not estimate the time he and his wife spent in operating the icehouse, other than "we opened the place together at the same time: and that he was at the icehouse throughout opening hours, except when he was looking for employment.

Albrecht, when asked by the General Counsel what efforts he had made to secure employment from the date of his discharge replied:

"Well, from July 22 or 23 [1953] to March, 1955, I was self-employed, but the first six months in the ice station, the reason I didn't seek other employ-

ment, I was trying to build up my business so I would'nt have to seek other employment, but what I was trying to do was build up the business for the first six months."

Admittedly, Albrecht had no outside employment throughout the time he and his wife were operating the business. Albrecht estimated his gross income from the icehouse business by adding 18 percent to his total purchased and his net income by deducting therefrom costs of operation or expenses such as gas, light, interest on loans, and other like items. Counsel stipulated, after checking the records during the recess of the hearing, that the receipted bills for 1953, 1954, and 1955 amounted to $20,796.75, $34,151.57, and $7,386.02, respectively. Using the above formula and figures, the General Counsel estimated the income from the icehouse on a quarterly basis, which he deducted as interim earnings, and arrived at the sum of $5,584.94, as net back pay, as appears in his "Corrected Earnings." The undersigned has not attempted to audit these figures.

Albrecht was unable to give any breakdown or percentage figures on the earnings received from the icehouse covering the period Aug. 10, 1953, to Dec. 31, 1953, because income was estimated on an annual basis at the end of the year. He further stated that about March 22, 1955, the icehouse was sold or leased to another individual, without any profit, and that he was merely paid dollar for dollar for stock and equipment.

In addition the business was in his wife's name. She reported it as hers in her income tax return and in his affidavit given to the Regional Office he claimed no part of its earnings as his.

pay period because Albrecht did not during that period make reasonably diligent efforts to seek employment and that the work in the icehouse was not self-employment within the rule, place weight upon supposed facts, which I think are immaterial and inaccurate, viz: "(1) that the icehouse business was his wife's, (2) that Albrecht testified that it was only for the first six months that he devoted full time to the icehouse, and (3) the other facts detailed by the examiner."

The "willful loss doctrine" acts to prevent any discharged employee from recovering back wages for the portion of the discharge period in which he does not use reasonable diligence in seeking to mitigate or minimize his losses. Bona fide self-employment will satisfy this duty to mitigate losses. National Labor Relations Bd. v. Efco Manufacturing, 1 Cir., 1955, 227 F.2d 675, 676; National Labor Relations Bd. v. Cashman Auto. Co., 1 Cir., 1955, 223 F.2d 832, 835–836; National Labor Relations Bd. v. Poultrymen's Service Corp., 3 Cir., 1943, 138 F.2d 204, 211. Further, it is immaterial whether or not the self-employment was financially successful since "the principle of mitigation of damages does not require success; it only requires an honest good faith effort." National Labor Relations Bd. v. Cashman Auto. Co., supra, 223 F.2d at page 836. There is, in my opinion, an abundance of evidence [1] that Albrecht's activities during this period amounted to such good faith effort.

My brothers seem to think that the ice business belonged to Albrecht's wife and consequently he was not actually self-employed. As shown in footnote 4 of the majority opinion, Albrecht furnished the capital to purchase the lot, construct the building and stock the store, all done in their joint names. Neither he nor his wife drew any salary but "lived off the business." The business was listed in his wife's name and, for income tax purposes, his wife reported the income as her own. Other than this income tax feature, all the evidence showed that Albrecht certainly had a half interest if not more. It was his and his wife's business, and he worked feverishly during the time in question to make it a successful operation.

[1] Accurately summarized in the Board's Brief as follows:

"At the time of his discharge, Albrecht and his wife jointly owned a drive-in establishment, called the 'E.A. Drive-Inn', at which groceries, beer, cold drinks, and ice were sold. They had then been operating the drive-in for over 8 months. The establishment had been open from 10 a. m. to 10 p. m., seven days a week, operated in the main by Mrs. Albrecht, whom Albrecht helped out during his varying off hours from work with the Company. Because Albrecht worked rotating shifts, the hours he could help out in the drive-in were limited.

"Upon his discharge, Albrecht began giving his full working time to the business. During the first six months after his discharge, namely from July 22, 1953, to February 1954, Albrecht devoted 15 hours a day and 7 days a week to its operation and was also aided by his wife. Thereafter, for the next 14 months, he continued to operate the business, but also looked for work elsewhere.

"Thus, in February 1954, Albrecht sought a job as constable or night watchman from Constable Bob Garcia. In April, Albrecht made a like request for Constable Hauck. During May and June he applied about six times for a job at Vane Hugo's garage. Also in June, he frequently discussed plans with Adolph DeLeon, a small contractor, regarding his performing rough carpentry on houses DeLeon was expecting to build. Albrecht had previously worked for DeLeon in his off-time. Several times between May and August, he asked Walter Czeck, who operated a Texaco service station, to give him a job. During July, August and September, Albrecht again saw DeLeon, Hauck and Czeck. Between September and November he frequently discussed job possibilities with J. R. Bedford who was planning to take over a Texaco service station. In the latter part of the same year, 1954, he tried for a job at Falstaff's, a beer distributor.

"On March 22, 1955, the Albrechts leased out their place of business. Making no profit, they were paid dollar-for-dollar for stock and equipment."

I believe that the facts as to the ice-house business and Albrecht's repeated attempts to secure employment are such as to support with more than subtantial evidence the Board's conclusion that Albrecht's conduct in that period measured up to the standards of diligence and good faith entitling him to his claim for back wages. I would enforce the order without modification.