## MOORESVILLE COTTON MILLS v. NATIONAL LABOR RELATIONS BOARD.

### No. 4207.

Circuit Court of Appeals, Fourth Circuit.

March 11, 1940.

Fred D. Hamrick, Jr., of Rutherfordton, N. C., and Zeb V. Turlington, of Mooresville, N. C. (Fred D. Hamrick, J. Nat Hamrick, and Hamrick & Hamrick, all of Rutherfordton, N. C., on the brief), for petitioner.

Leonard Appel, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Mortimer B. Wolf, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

## SOPER, Circuit Judge.

By a prior decision in this case, 4 Cir., 94 F.2d 61, a determination of the National Labor Relations Board of June 10, 1937 was affirmed, insofar as the Board found that eight workers in the Mooresville Cotton Mills, after a strike on September 23, 1935, had been refused reinstatement between October, 1935 and February, 1936 on account of Union activities. But that part of the order of the Board which directed the employer to reinstate the men and make them whole for any loss of pay they might have suffered was modified as to four of them, because it appeared to the court from the record in the case that they had obtained regular and substantially equivalent employment elsewhere. We were of opinion that the power of the Board under § 10 (c) of the National Labor Relations Act, 29 U.S.C.A. § 160 (c), to require the reinstatement of employees with back pay, did not extend to workers who had gotten other equivalent employment, since they no longer met the definition of "employee" contained in § 2 (3) of the Act, 29 U.S.C.A. § 152 (3). Upon rehearing, the legal question was reexamined, and our opinion was reaffirmed, 4 Cir., 97 F.2d 959; but it transpired that the Board had never passed upon the equivalence of the new employment, and the case was therefore remanded to the Board for a determination of this matter.

Pursuant to this decision a hearing was held before a trial examiner of the Board on October 24, 25 and 26, 1938, and evidence was offered as to the kind of employment which each of the men had secured. On September 16, 1939, the Board made supplemental findings of fact, wherein it determined that subsequent to the strike and to the company's refusal of reinstatement and up to the hearing in October, 1938, the men had not obtained any employment which was regular and substantially equivalent to the positions formerly held by them in the Mooresville Cotton Mills.

This finding is challenged by the employer on the ground that it was not supported by the evidence. It is contended in the first place that in reviewing the finding this court is at liberty to pass upon the weight and credibility of the evidence because it relates to the jurisdictional fact of employee status, and under the rule of Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598, all decisions of an administrative board upon questions of jurisdiction are reviewable by the courts. We are of opinion, however, that under the circumstances of this case we are bound to follow the usual rule and accept the findings of the Board if there was substantial evidence to support them. The jurisdiction of the Board in this controversy has already been established. The applicability of the statute to the business of the mill was shown in the first decision of this court, and the status of the four men as employees of the mill at the time of the strike in 1935 was conceded. Thus, the fundamental jurisdictional facts have already been determined and the question of the equivalence of the subsequent employment obtained by the men was merely incidental to the main inquiry as to whether the employer had been guilty of unfair labor practice, and if so, what action might properly be required of the employer to effectuate the purposes of the Act. In this connection see Washington, Virginia & Maryland Coach Co. v. Labor Board, 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965, in which the Supreme Court rejected without discussion the contention that the reasons for the discharge of an employee are constitutional facts which the courts must determine for themselves.

The parties to the cause are also at odds as to the principles which should control in determining whether an em-

ployee, who has been wrongfully refused reinstatement by his employer, has obtained other "regular and substantially equivalent employment" and has therefore lost his former status with its right to reinstatement. The controversy requires an interpretation of the quoted phrase. On the part of the mill it is contended that the words are used in their ordinary significance, and that in deciding a question of equivalence, attention must be confined to the elements which enter into the relationship of employer and employee; and hence it is proper to compare the kind of work, the hours of labor, the wages, and the tenure of the two jobs, but not the personal preference or convenience of the worker with regard to matters which have no bearing upon the work itself, such as the location of the work and its proximity to the worker's accustomed home. On the other hand, the Board contends that the equivalence of the new to the old employment should be tested in the light of all the factors which would be considered by a reasonable person in the position of the worker, including the inconvenience or hardship involved in changing his place of residence.

Our view is that in appraising the equivalence of the two employments, attention need not be strictly confined to a comparison of the working conditions per se. It is true that reinstatement is denied to a worker who has taken substantially equivalent employment elsewhere; but since the purpose to protect the worker in the exercise of his right of collective bargaining is clearly manifested by the general provision for the restoration of his job if he has lost it through his employer's illegal acts, it does not seem reasonable in considering the question of equivalence to exclude from consideration all the personal factors which would influence the worker's choice. Primary importance should of course be accorded to a comparison of the working conditions; and it lies with the Board and not with the worker to determine what weight in making the comparison is to be accorded to other factors which seem to him important. The situation, as the Board points out, is somewhat analogous to one which confronts an employee, wrongfully discharged, who sues for breach of his contract of employment. He cannot recover damages for losses which, in the exercise of due diligence, he could have avoided; but he may refuse to accept other employment "which is danger-

ous, or distasteful and essentially different from that for which he is employed, nor is he necessarily obliged to accept employment at a distance from his home. * * Whether or not he is reasonable in not accepting or seeking a particular employment is a question for the triers of fact". Restatement Agency, § 455, Comment d; Restatement Contracts, § 336; Williston on Contracts, Revised Edition, Vol. 5, § 1359; San Antonio & A. P. Ry. Co. v. Collins, Tex.Com.App., 61 S.W.2d 84, 89; Torson Construction v. Grant, 251 Ky. 800, 66 S.W.2d 79; News Publishing Co. v. Burger, 2 Tenn.Civ.App. 179; Armfield v. Nash, 31 Miss. 361; 6 L.R.A.,N.S., 121; 28 A.L.R. 736, 742. In like manner the location of the new employment in a Labor Board case may be relevant to the question of its equivalence to the former employment; and it is for the Board to determine whether, under the evidence, the location is a factor which may be reasonably taken into account. While the question has not been directly passed upon elsewhere, the conclusion reached seems to be in accord with the views expressed in National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533, and National Labor Relations Board v. Botany Worsted Mills, Inc., 3 Cir., 106 F.2d 263.

■ Another question in the instant case relates to the time when the alleged equivalent employment was secured. We held in our earlier decisions that the new employment in order to come within the meaning of the definition in § 2 (3) of the Act need not be secured before the occurrence of the unfair labor practice, but we had no occasion to consider whether such new employment must have been secured before the Board's order of reinstatement. It was decided in National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533, that employment obtained subsequent to the Board's order of reinstatement should not be considered in passing upon a petition to enforce the order, because it is the duty of the Board to survey the facts as they exist at the time of its decision, and to determine whether a former worker is then an employee as defined by the Act. Relying on this view, the Board now contends that the new employment of the four men may not be considered unless it was obtained prior to June 10, 1937, when the order of reinstatement was promulgated. The company, on the other hand, contends that any new employment is relevant

if obtained before the final determination of the case by the reviewing court. We are in accord with the decision in the Carlisle case, but the crucial date in the instant case is not June 10, 1937, because the order of reinstatement, then passed, was based on the erroneous theory that new employment obtained after the unfair labor practice may not be considered, and it became necessary to remand the case for a redetermination. Thereafter, in October, 1938, additional evidence was taken which related to employment secured both before and after June 10, 1937, and all of it was considered by the Board in its final decision of September 16, 1939. Under these circumstances, it is proper for us to consider all of the evidence in the record, for it is obvious that the order of reinstatement became effective on the last mentioned date.

■ A further question arises as to the point of time which must be chosen in determining the character of the old employment with which the new employment must be compared. On the part of the employer it is urged that it is the old job, as it existed when the worker left it, which constitutes the norm or basis of comparison. On the other hand, the Board contends that the equivalence of the new employment should be determined by comparing it with what the worker would have had but for the unlawful discrimination against him, and therefore that conditions in the plant subsequent to the cessation of the work, be they better or worse, should be considered in making the decision.

■ In our opinion the view of the Board is correct. The power of reinstatement is remedial and it may be exercised whenever the Board is of the opinion based upon substantial evidence that the cessation of work was brought about by an unfair labor practice on the part of the employer, and that reinstatement will effectuate the policies of the Act. Reinstatement necessarily implies the passage of time from and after the former employment and the restoration of the employee to a place whose incidents in the meantime may have changed with business conditions. The Act contemplates that the power of the Board to reinstate the worker shall continue unless he gets for himself a new place as good as that to which the Board could have restored him, if the power had been exercised at the time the new employment was secured. We are in accord with the following

quotation from the Board's opinion in this case:

"In determining whether other employment which the individual secured was equivalent, we shall compare it to the employment which he would have had but for the unlawful discrimination. The employment which was unlawfully terminated had, as one of its features, the prospect of continuance, and therefore can be evaluated properly only by reference to the terms, conditions, and other attributes which would have obtained if the unfair labor practices of the employer had not intervened. If the employment enjoyed by the individual before the discrimination would have become more desirable or less desirable had it continued, the eventuality must be considered in ascertaining the equivalence of other employment secured by him. Where evidence as to the subsequent character of the original employment is lacking, we shall, however, take the history of the employment before the discrimination as determinative of the course which the employment would have followed thereafter, on the basis of the presumption that a condition once existing tends to continue.

"The respondent objects to the Board's using as a basis for comparison the attributes of the employment as it would have been save for the discrimination, on the ground that the determination of those attributes requires speculation and cannot be made with any degree of certainty. Speculation and uncertainty are involved to a greater or less degree in the resolution of almost every controverted factual issue, however, and their presence here cannot excuse the Board from the performance of its duties as a trier of fact."

■ We come then to a review of the evidence concerning the new employment obtained by each of the four men in order to determine whether there is substantial evidence to support the findings of the Board. Van Helms had been employed in the Mooresville Cotton Mills for 28 years, during the five years preceding the strike as a loom fixer. For twelve years he had owned his own home on the outskirts of the town, about a mile from the mill. In connection with the house he had 5 acres, of which he cultivated 2 as a garden. Three of his four children and a stepson resided with him. His wife had resided in Mooresville for more than 25 years and was unwilling to leave. At the time of the strike he worked on the first eight hour

shift, from 7 a. m. to 3 p. m., and was able to reach the mill in time if he left home at 20 minutes of 7. He usually made the trip in his automobile at an estimated cost for gasoline of 66c per week. His wages for 38 weeks in 1935 were 50c an hour, and he averaged $19.40 per week.

During 1936 and the first half of 1937, the mill worked full time. In 1936 the wage rate was the same as at the time of the strike in 1935, but in 1937 and 1938, the hourly rate was increased, and varied from 56c to 60c an hour. During 1936, 1937 and 1938 Van Helms worked at three separate employments as follows:

From January 11 to May 9, 1936 at Killingsly Worsted Mills at Stony Point, North Carolina, 28 miles from Mooresville.

From July 11, 1936 to January 30, 1937 at the John Watts Mills at Roxboro, North Carolina, 150 miles from Mooresville.

From February 6, 1937 to March 26, 1938, at the Killingsly Worsted Mills at Stony Point.

The wages on the first of these jobs was substantially less than that paid at the Mooresville in 1935 and 1936, and in addition the cost of transportation between the worker's home and the mill approximated $2 per week. During the second employment Van Helms lived at Roxboro and paid board at the rate of $5 per week, visiting his family in Mooresville once a month at a transportation cost of $5. He received higher wages than that paid at Mooresville in 1936; even after allowing for his increased expenses, he suffered no monetary loss. He was, however, obliged to live separate and apart from his family, or to abandon his home and move them to Roxboro, which he was unwilling to do. During his third employment, that is, his second at Stony Run, Van Helms received wages at a rate in excess of that paid to him at the Mooresville Mill at the time of the strike, but less than that paid to similar workers in the Mooresville Mill in 1937 and 1938. In addition he worked on the afternoon and evening shift from 3 to 10 p. m. Summarizing the evidence with respect to Van Helms, it appears that in his first job, the pay was less; in his second job, the location was so much worse as to be reasonably taken into consideration, and in the third, the pay was less than that obtainable at Mooresville at the same period. We conclude, therefore, that there was substantial evidence to support the conclusion of the Board that the subsequent employments obtained by Van Helms were not the equivalent of the position to which he was entitled at Mooresville.

A. J. Helms was employed as a weaver in the Mooresville Cotton Mills almost continuously for 27 years prior to the strike in 1935. He had lived in Mooresville since 1908. He was the father of six children. Two of them lived at home in 1935 and one at his son-in-law's in Mooresville. His wife was born in Iredell County in which Mooresville is located. During 37 weeks in 1935 he worked in the Mooresville mill for 45c per hour, averaging $15.80 per week. He worked on the day shift from 7 A.M. to 3 P.M. During 1936 the rate of wages for his job in Mooresville remained the same as it had been in 1935, but subsequent to February 6, 1937, the rate was increased. During the period from December, 1935 to September, 1938 A. J. Helms secured six different positions as follows:

From December 27, 1935 to April 18, 1936, and from May 25 to August 22, 1936, at the Morgan Cotton Mills located at Laurinburg, North Carolina, 130 miles from Mooresville.

From April 18 to May 23, 1936 at the Killingsly Worsted Mills.

From August 22, 1936 to June 25, 1937 at the Cornelius Cotton Mills, 7 miles from Mooresville.

From July 17, 1937 to January 15, 1938 at the Highland Park Cotton Mills in North Carolina, 28 miles from Mooresville.

From June 8, 1938 to September 24, 1938 at the Lock Mills at Concord, North Carolina, 25 miles from Mooresville.

It is not necessary to discuss the evidence with reference to any of these positions except the first and third employments at the Morgan Cotton Mills. All of the other jobs paid less money as compared with the worker's position at Mooresville at the time of the strike, and still less than the former position at Mooresville. paid during 1937. The positions at the Morgan Cotton Mills, while the mills were working at full time, paid the worker more than he received at Mooresville in 1935, but the average earnings were less than those at Mooresville during 37 weeks in 1935. In addition A. J. Helms was obliged to pay board at Laurinburg at the rate of $6 per week and the cost of transportation per week in trips to his home at Mooresville

184

was $4. The hours of labor were not so desirable. He worked either on the night shift from 6 P.M. to 4 A.M. or the afternoon shift from 3 P.M. to 11 P.M. The finding of the Board as to this man should also be affirmed.

George Van Benfield was regularly employed as a doffer in the Mooresville Mill from 1931 to 1935. His wages were 33c per hour, and he averaged $10.15 per week in that year. He worked on the second shift from 3 to 11 P.M. Subsequent to the strike, he secured two positions—one at the Cornelius Cotton Mills, 7 miles from Mooresville, between March, 1936 and May 14, 1937, and the second at the Gem Yarn Mills at Cornelius from May 27, 1937 to March 3, 1938. During the first employment at Cornelius, Van Benfield earned 24c per hour from March to November, 1936, 25.2c per hour from November, 1936 to March, 1937, and thereafter 27.7c per hour. His average earnings for 60 weeks were $10.455 per week, which were slightly in excess of that received at Mooresville in 1935, but he was obliged to work 16 hours more per week to get this result. His hours were not so desirable, as he worked from 6 P.M. to 4 A.M. During his second job at the Gem Yarn Mills he was paid 30c per hour, and averaged $11.37 per week, but during the same period at Mooresville, the wage rate was in excess of these amounts. Under these circumstances, there was substantial evidence to support the Board's finding that the new employments were not equivalent to the old.

C. E. Rogers was employed for 18 years at Mooresville, during the last seven years of that period as a weaver. He was paid for piece work and averaged 45.8c per hour and $18.33 per week in 1935. After the strike he first held three small jobs which were negligible and need not be discussed. From March 15, 1936 to October 1938 he was employed at the Killingsly Worsted Mills at Stony Point, 28 miles from Mooresville. During the first two months he was employed as a loom fixer and later on towel warps. At first he was paid at the rate of 30c per hour, from May 1936 until January 1937 at the rate of 45c per hour, and in 1937 at the rate of 49.5c per hour. His average earnings for the entire period were $18.90 per week. The rate per hour at Stony Point was 3.7c higher in 1937 than the rate at Mooresville in 1935; but the rate at Mooresville in 1937 was 55.4c per hour. Rogers moved his

family to Stony Point and as a result, his cost of living was increased. At Mooresville he lived in a separate house on his father's farm where he had a lower rent and the opportunity to make a garden. Under all these circumstances, there was substantial evidence to support the finding of the Board that the new employment was not equivalent to the old.

Our conclusion is that the determination of the Board should be sustained. When a rehearing of the case was granted at the request of the Board, the decree of this court modifying the previous order of the Board was revoked and the matter was held in abeyance pending the determination by the Board of the questions of fact involved in this appeal. A decree of the court will accordingly be entered, enforcing the order of the Board as originally passed except that § 2 (c) of the order with regard to the posting of notices will be modified for the reasons set out in our opinion in 97 F.2d 959, so as to require the employer to post notices immediately in conspicuous places throughout the plant containing a copy of the order of the Board as modified, with a statement that the order as modified has been approved by this court and is binding upon the employer.