**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MOSS PLANING MILL CO., Respondent.**

**No. 6605.**

United States Court of Appeals Fourth Circuit.

Argued June 14, 1955.

Decided Aug. 1, 1955.

Frederick U. Reel, Atty., National Labor Relations Board; Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, Chicago, Ill., David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and John E. Jay, Atty., National Labor Relations Board, Washington, D. C., on brief), for petitioner.

John A. Wilkinson, Washington, D. C., for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case was initially before us upon the petition of the National Labor Relations Board to enforce its order of March 10, 1953, which directed Moss Planing Mill Company (hereinafter called Moss), among other things, to reinstate employees Lee A. Wynne and Roy Ersiel Fulcher and to make them whole for any loss of pay they may have suffered because of the unlawful discrimination practiced against them. On July 24, 1953, we rendered an opinion and entered a decree enforcing the order of the Board in full, 206 F.2d 557. Thereafter, on August 10, 1953, Moss apparently offered Wynne and Fulcher reinstatement, thereby setting a terminal date to its back pay liability.

Informal negotiations to determine the precise amount of back pay failed. The Board directed the holding of a supplemental hearing for the purpose of taking evidence and making a determination of the amount of losses incurred by each employee as a result of the discrimination practiced by Moss.

Upon all the evidence contained in the record of the supplemental proceeding, the Board concluded that Wynne suffered a net loss in pay of $3,710.29 during a

period of about 30 months, including the time during which he was physically incapacitated as a result of the bodily injuries inflicted upon him by Moss's Secretary-Treasurer at the time of his discriminatory discharge. Similarly, the Board concluded that Fulcher suffered a net loss in pay of $2,184.42 over a period of nearly 3 years, including the time Moss discriminatorily denied him regular employment prior to his discriminatory discharge in May, 1951. The proceeding is now before us on the Board's motion to amend the decree by incorporating in it the specific amounts found by the Board to be due Wynne and Fulcher.

The Board found that Wynne would have earned $4,454.19 from Moss but for the discrimination against him. The Board offset against that figure the sum of $449.20, which represented Wynne's net earnings during the period between his discharge and the offer of reinstatement, and the sum of $294.70 which represented losses which Wynne may have incurred by remaining away from the employment market for two extended periods. Accordingly the Board awarded Wynne $3,710.29. Moss challenges the computation on two grounds: (1) that the Board should have found that Wynne wilfully incurred loss by failing to secure more employment; and (2) that the sum of $432, received by Wynne under the North Carolina Workmen's Compensation Act for the injury inflicted at the time of his discharge, should likewise be deducted from the amount due him.

The Board further found that Fulcher's earnings, had Moss not discriminated against him, would have been $3,638.34, instead of his actual earnings of $1,543.37. Excluding from consideration the first quarter of 1953 when Fulcher's actual net earnings exceeded the wages Fulcher would have received in the employ of Moss during this period, the Board computed Fulcher's net loss to be $2,184.42. Moss offered no specific alternative computations but argued, primarily, that Fulcher, like Wynne, wilfully incurred losses and should not be awarded any back pay.

We first take up the case of Wynne. Moss argued that the Company should be credited the sum of $432 which was the amount Wynne was awarded in November, 1953, by the North Carolina Industrial Commission. In support of its position Moss asserted that Wynne had been awarded back pay during the period for which he was subsequently awarded compensation by the Industrial Commission, so that unless a deduction of $432 is made Wynne would be made more than whole. The Board, with former member Beeson dissenting, rejected this contention, explaining that the compensation which Wynne obtained under the laws of the State of North Carolina was merely a collateral benefit which, like other collateral benefits such as unemployment compensation, is not an item which should be deducted from back pay.

In reaching this conclusion, the Board relied heavily upon National Labor Relations Board v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 339, 95 L.Ed. 337, which held: " * * * To decline to deduct *state unemployment compensation benefits* in computing back pay is not to make the employees more than whole * * *." (Italics ours.) In his opinion in this case, Mr. Justice Minton, 340 U.S. at page 364, 71 S.Ct. at page 340, said:

"Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state."

We think that workmen's compensation payments, judged by the very criteria set out by Judge Minton in the

Gullett case, are clearly distinguishable from unemployment benefits and that the Board erred in failing to deduct the workmen's compensation payments from the amount found by the Board to be due to Wynne from Moss.

Unemployment compensation is paid by the State itself from taxes and is an obligation imposed upon the public. It is indeed a welfare statute within the usual meaning of the term. The employer participates only as a taxpayer. As such, his obligation is not to the recipient of unemployment benefits but to the State. There is no contractual relationship between him and the recipient. It is, of course, quite clear that any benefit that the recipient of unemployment compensation receives is collateral to the fact that he was working for a particular employer. Chapter 97 of the General Statutes of North Carolina is entitled, Workmen's Compensation Act. It provides, as do similar acts in other States, for mutual concessions by employee and employer, Winslow v. Carolina Conference Association, 211 N.C. 571, 191 S.E. 403. The North Carolina Supreme Court said in Barber v. Minges, 223 N.C. 213, 25 S.E.2d 837, 839, "The primary purpose of legislation of this kind is to compel industry to take care of its own wreckage." The State is not the instrumentality through which payments are made. On the other hand, payments come from the employer himself through the medium of his agent, his insurance carrier. The workmen's compensation payments made here were so directly derived from the employer that we feel a back pay allowance for the period during which these payments were made would make the employee more than whole at the expense of the employer.

We now come to the question of whether Wynne made adequate and reasonable efforts to find suitable work. He was pronounced by Dr. Piver as fit to resume work on May 18, 1951. The Trial Examiner found:

"On the basis of the evidence of Dr. Piver and Dr. Watts, the under-signed finds that Wynne in so far as this proceeding is concerned, was not permanently injured and, as related by Dr. Piver, was able to resume his duties as fireman on May 18, 1951. However, the undersigned is convinced that at times Wynne suffered pains and aches in his back and had trouble wearing his artificial leg, although not to the degree stated at the hearing."

The Trial Examiner did not find that these pains and aches or his alleged difficulty in wearing his artificial leg in any way interfered with his employability. The Trial Examiner further stated that Wynne was wrong in his statement as to the degree of his hurt but he did not say how far Wynne was wrong. Firing is a hard job. Wynne was asked this question, "Yet you were a man previous to this injury who could do anything that a man with two legs could do?" He made this answer: "I could get one hundred people up here to prove I did do any kind of work that any other man was doing around here in Beaufort County, such as labor work." Wynne further testified: "I tried to confine myself to garden work, something light."

If the findings of the Board are to be accepted by us, Wynne is to be credited with interim earnings for the period from January 18, 1951 until August 10, 1953, of less than $400.00. In 134 weeks, he earned, according to the Board's calculations, which they present to this Court, $381.71, or approximately $2.85 a week. This was a man who was physically able, according to the finding of the Trial Examiner, on May 18, 1951, and thereafter, to fire a steam boiler in a saw mill.

The Trial Examiner never found that Wynne made adequate and reasonable efforts to find work. He found only that Wynne did not have to accept agricultural jobs because they were manifestly not equivalent to the position that Wynne held at the time of his discharge and because they could not be considered desirable new employment. And from

the Board's brief we quote: "Wynne was under no obligation * * * to accept any agricultural employment which is not in the 'same line of business' as the work which he performed for the Company * * *. Neither was Wynne required to accept the humiliation of working at tieing tobacco which was performed only by women." With this we cannot agree. And we are convinced, from a study of the record, that Wynne could readily have earned, had he made reasonable efforts to obtain suitable employment, much more than the utterly insignificant sum found by the Board.

In National Labor Relations Board v. Pugh & Barr, Inc., 4 Cir., 207 F.2d 409, we said:

"Brammer was an ordinary unskilled laborer and it appears that the large amount of back pay awarded him was due to the fact that the earnings credited for a period of two years was only $294.20. It is incredible that Brammer could not have earned more than this during that period if he had made reasonable efforts to find employment, * * *. The awarding of so large a sum as back pay without the finding of special circumstances justifying it cannot be sustained. We shall accordingly set aside the Board's order and remand the case to the Board with direction that it make specific findings of fact with respect to the matter and award to Brammer no more than the difference between what he could have earned by working for respondent if he had not been wrongfully discharged and what he could have earned elsewhere if he had used due diligence to secure other employment."

This brings us to Fulcher. The Trial Examiner found and the Board adopted his finding that Fulcher earned a total of $1,543.37 between May 16, 1951, and August 10, 1953. This included $400.00 which the Board found that he earned from preaching. This period is approximately 117 weeks. This is approximately a weekly earning of $13.19. If we deduct the sum credited by the Board as additional income from preaching, the average weekly wage drops to approximately $9.77. Here was a man with a big family, able-bodied, semi-skilled in lumber mill operations, with knowledge of agricultural work, an all-round worker of at least average capabilities and know-how, yet the Board found that he had done all that might reasonably be expected of him when to the earnings which he admitted, enough more was added to bring his weekly wage up to $13.19.

Washington is a rural town of some 10,000 population, in Eastern North Carolina. In 1951, 1952 and 1953, practically its sole industries were lumber mills. It is surrounded on all sides by an agricultural area; the main crop is tobacco, and irish potatoes are also important in the farm economy of the area. Fulcher admitted a long background of experience as a farm laborer; claimed a high degree of skill, using the phrase that he was a "tobacco worm." As a matter of fact, the economy of the entire area is built around the cultivation and sale of tobacco. The record shows that the wage scale paid by farmers eager for farm labor during the tobacco harvesting season is quite high.

We cannot accept the Board's conclusion that Fulcher was not obligated to seek and accept agricultural employment. The record discloses that such employment was available. The Board seems to think that Fulcher was bound to accept no work save preaching and work in saw mills. To us that seems quite unreasonable. See the opinion of Judge Soper, speaking for our Court, in Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 110 F.2d 179; National Labor Relations Board v. Pugh & Barr, Inc., 4 Cir., 207 F.2d 409; Torson Construction Co. v. Grant, 251 Ky. 800, 66 S.W.2d 79; Simon v. Allen, 76 Tex. 398, 13 S.W. 296, 141 A.L.R. 668.

We hold, therefore, that the amount awarded to Fulcher by the Board must

be reduced by a sum equal to what Fulcher would have earned had he reasonably sought employment of a nature which he was obligated to seek and accept.

We shall, accordingly, set aside the Board's order with the direction that it make findings of the amount due Wynne, with a deduction of the amount awarded him under the Workmen's Compensation Act and with the further deduction of what he could have earned elsewhere had he used due diligence to secure other suitable employment. As to Fulcher, the Board's order is set aside with the direction that the Board deduct from the amount awarded him such an amount as Fulcher could have earned had he used due diligence to seek other suitable employment, including agricultural employment.

Order set aside and case remanded.