**FLORENCE PRINTING COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Charleston Typographical Union No. 43,**
Intervenor.

No. 10634.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 9, 1966.

Decided March 21, 1967.

Boreman, Circuit Judge, concurred in part and dissented in part.

J. W. Alexander, Jr., Charlotte, N. C. (Alvin A. Coleman, Jr., Florence, S. C., Blakeney, Alexander & Machen, Charlotte, N. C., and Wright, Scott, Blackwell & Powers, Florence, S. C., on brief), for petitioner.

Wayne S. Bishop, Attorney, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Solomon I. Hirsh, Attorney, N.L.R.B., on brief), for respondent.

George Kaufmann, Washington, D. C. (Gerhard P. Van Arkel, Washington, D. C., on brief), for intervenor.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

In Florence Printing Co. v. N.L.R.B., 333 F.2d 289 (4 Cir. 1964), we enforced an order of respondent which, *inter alia*, required petitioner to reinstate certain striking employees with back pay and interest. The striking employees had applied for reinstatement on July 7, 1963, but were not reinstated until approximately one year later. Even then, petitioner refused reemployment to one, and its refusal was upheld by the Board.[1] The Board's order, which petitioner now asks us to set aside and which the Board asks us to enforce, directed petitioner to pay certain designated amounts to twelve of the formerly striking employees as back pay and interest for the period July 7, 1963 to the date of reinstatement.[2] We think the Board's order should be enforced.

Enforcement of the order is resisted, in whole or in part, on three grounds. First, the striking employees, against whom unfair labor practices were previously found to have been directed, received, during the time petitioner refused to reinstate them, strike benefits paid by their union from a trust fund estab-

---

1. Sustaining one of petitioner's exceptions to the examiner's recommended order, the Board refused to order the reinstatement of Romelous E. Bass, finding that Bass committed an unprovoked physical assault on one of petitioner's officials, and thus forfeited his right to reinstatement.

2. Review and enforcement of the order are sought pursuant to the provisions of §§ 10(f) and 10(e) of the Act, respectively. 29 U.S.C.A. §§ 160(f) and 160(e).

lished for that purpose. It is contended that the amount of their back pay awards should be reduced by the amounts of the strike benefits. The wages that they would have earned, had they been reinstated on July 7, 1963 have been stipulated, as have the amounts of strike benefits.[3] Second, it is contended that as a question of law Glenn Johnson, one of the striking employees, forfeited his right to back pay by refusing a specific job offer in Rock Hill, South Carolina, a town one hundred miles distant from the place of his employment with petitioner. Third, it is contended that all of the employees wilfully incurred a loss of earnings and should, therefore, be denied back pay. This contention is grounded upon the assertion that the record discloses other job opportunities in Florence during the period in question, that it was the burden of General Counsel to the Board to present proof to explain why the strikers did not avail themselves of these opportunities and that he failed to meet that burden. We consider these contentions seriatim.

### —Set-Off of Strike Benefits—

Before dealing with the legal question presented, we must first state additional facts. The benefits were paid from a trust fund established and administered by the international union and funded by a one per cent assessment on the earnings of active members.[4] By the international union's constitution and by-laws, benefits from the fund were payable *only* during strikes, lockouts and shutdowns. Benefits were scaled from 60% of regular pay for members having dependents to 40% for members not having dependents, with minimum weekly benefits of $36.00

and $24.00, respectively. To be entitled to benefits, a member was required to report daily "to the proper officer of the subordinate union while the strike continues." Further, a striker refusing work while out on strike "shall be debarred from all benefits under this law, and for each day's work performed in excess of one shift one-fourth of the members' regular strike benefits for that week shall be deducted." Reserving its right to claim otherwise, the union reported benefits paid to the Internal Revenue Service as "income," and presumably withheld income taxes in appropriate cases. There was evidence before the trial examiner that strikers, *on days that they did not have other employment*, were required to picket and that strike benefits would be paid to strikers who were ill and were unable to report or picket.

■ Petitioner contends that the strike benefits were compensation for picketing services, so that the strike benefits were "earnings" to be set off against petitioner's liability for back pay. The examiner made an express factual finding, adopted by the Board, that there was an absence of evidence to show that services were rendered in exchange for the benefits, and hence concluded, as a legal question, that set-off was not proper. From our examination of the record as a whole, we find no factual basis to conclude that strike benefits were paid as a condition precedent to, or in compensation for, picketing. True, picketing was required of strikers not otherwise gainfully employed, but the constitution and by-laws of the international union, not controverted by any other substantial evidence,[5] established that a striker's

---

3. The examiner, because he thought the amounts of strike benefits were excessive, expressed the belief that the record was erroneously transcribed. He invited a motion to correct the transcript. No such motion has been made.

4. The original assessment was made for a three-month period. At any time that the *res* of the trust fell below $500,000.00, the assessment once again became operative and remained in effect for three months after the *res* grew to $500,000.00.

5. There was evidence that Bass assigned lack of union permission to explain his refusal to accept a job offer. The job offer did not occur during the period in question and Bass' case is not before us, the Board having refused to order his reinstatement. There was no evidence that refusal of such permission was general union policy. Indeed, strikers, during the period in question, accepted some interim employment.

first obligation was to seek interim employment to reduce the drain on the strike benefit funds of the international union. We think the Board's factual conclusion was correct.

Whether, as a legal question, strike benefits which are not shown to be "earnings" should be set off against an award for back pay, in diminution thereof, has been directly decided in one case cited to us, N.L.R.B. v. Rice Lake Creamery Company, 112 U.S.App.D.C. 323, 365 F.2d 888 (1966). As a matter of policy, the Board has adopted the common law "loss of earnings" rule, under which the measure of an employee's recovery is the earnings which he has lost, less any other earnings which he has obtained or wilfully refused to obtain. Knickerbocker Plastic Co., Inc., 132 N.L.R.B. 1209 (1961); Kartarik, Inc., 111 N.L.R.B. 630 (1955); L. B. Hosiery Co., Inc., 99 N.L.R.B. 630 (1952); Columbia Picture Corp., 82 N.L.R.B. 568 (1949). Since Standard Printing Company of Canton, 151 N.L.R.B. 963 (1965), strike benefits have been treated as an element *not* to diminish the amount of back pay award. In the case at bar, the Board, in applying the common law loss of earnings rule, again deemed the strike benefits as "collateral," having no effect to diminish an award for back pay. From the *Rice Lake* and other decided case in analogous situations, we think the Board reached the correct legal conclusion.

National Labor Rel. Bd. v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), is the controlling authority. There, the question was raised as to whether the Board must deduct from back pay awards to discriminatorily discharged employees sums paid to them as unemployment compensation by a state agency. In concluding that the Board was not required to give effect to such a set-off, the Court placed its decision on two grounds. Repeating its holding in Marshall Field & Co. v. National Labor Relations Board, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744 (1943), it held that benefits received by employees under a state employment compensation act were plainly not "earnings." In the *Marshall Field* case the Court did not have before it the question of whether the Board had authority to make such an order, but that question was presented in the *Gullett Gin* case; and, as a second ground of the Court's opinion in the latter, it held that the Board had authority to adopt the policy of refusing to give effect to a set-off because the benefits were collateral and not direct.[6] Earlier, in National Labor Relations Board v. Brashear Freight Lines, 127 F.2d 198 (8 Cir. 1942), it had been held that the amount of back pay ordered should not be reduced by the value of groceries furnished a striker and his family by the union at irregular intervals. In N.L.R.B. v. Rice Lake Creamery Company, supra, it was flatly held that the Board, in the exercise of its discretion, properly refused to deduct the amounts of strike benefits from gross back pay when some benefits were

6. In this regard, the Court said:
"Such action may reasonably be considered to effectuate the policies of the Act. To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given or should be given to collateral *losses* in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.
" * * * Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. * * * We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering back pay does not make the employees more than 'whole' as that phrase has been understood and applied." 340 U.S., pp. 364–365, 71 S.Ct. pp. 339–340.

paid after picketing ceased and when the amount of the benefits was not entirely related to the hours of picketing. 365 F. 2d p. 893.

The only decision remotely in conflict with these cases is our own decision in National Labor Rel. Board v. Moss Planing Mill Co., 224 F.2d 702 (4 Cir. 1955), in which we held that workmen's compensation payments should reduce the amounts payable under a back pay award. Notwithstanding the decision in *Gullett Gin* and the discussion contained therein concerning the fact that unemployment compensation benefits were financed by a state tax on employers, we thought that the fact that workmen's compensation benefits came from the employer through the medium of his agent, his insurance carrier, would unjustly enrich an employee if the benefits were not applied in diminution of the back pay award. That case has no application here, because, indisputably, the strike benefits were financed solely by an assessment on the employees. Employees receiving strike benefits receive back only their own contributions and those of fellow-employees.

Because strike benefits are funded solely by employee assessments, and because we find no evidence that any service on the part of the employee was required as a condition precedent to the receipt of strike benefits, we think that they must be treated like unemployment compensation benefits and governed by the decision in the *Gullett Gin* case. *Gullett Gin* also disposes of another of petitioner's contentions, namely, that some employees may be made more than whole. In an individual case that may be so, yet—to mention only one possible collateral loss—we are aware that we are living in an age where consumer goods are generally acquired on credit. A protracted strike in protest for what has been found to be an unfair labor practice may well mean for many individuals that their equity in automobiles, household ap-

pliances, and the like, purchased on credit, has been wiped out. The back pay award does not take these factors into consideration and makes no allowance therefor.[7] In short, as was said in *Gullett Gin*, back pay as ordered by the Board in this case does not make the employees " * * * more than 'whole' as that phrase has been understood and applied." Id., p. 365.

### —CLAIMED FORFEITURE BY GLENN JOHNSON—

During the period in question, Glenn Johnson, who was chapel chairman of the union at petitioner's establishment, received an offer of a permanent job at his trade at a salary of $115.00 per forty-hour week from the Evening Herald of Rock Hill, South Carolina. The offer came to him directly from the publisher of the paper; Johnson's previous experience with job offers was that they emanated from foremen. Rock Hill is one hundred miles from Florence. Johnson, who was thirty-four, and his wife were both natives of Florence. They were buying a house, and had two young children, one of whom attended school in Florence. Before refusing the job offer, Johnson conferred with union officials.

Petitioner argues that Johnson's refusal to accept this job offer legally constituted a forfeiture of his right to back pay. The trial examiner and the Board found otherwise. While the trial examiner found that Johnson was suspicious, as a result of the offer's being made by a publisher rather than a foreman, that its ultimate purpose was to remove him from a position of leadership in the strike, the examiner's legal conclusion that Johnson did not forfeit his right to back pay was grounded upon the distance between Rock Hill and Florence, and the disruptive effect of the move on his family and his position in the Florence community.

As we pointed out in Mooresville Cotton Mills v. National Labor Re-

---

7. Cf. N.L.R.B. v. Rice Lake Creamery Company, supra, which sustained an order to pay hospital and medical expenses in- curred by employees during a strike when the employer suspended its contribution to group medical and hospital insurance.

lations Board, 110 F.2d 179 (4 Cir. 1940), a wrongfully discharged employee cannot recover damages for losses which, in the exercise of due diligence, he could have avoided; but we recognized also that he may refuse to accept other employment which is dangerous, distasteful or essentially different from that for which he is employed. We added, " * * * nor is he necessarily obliged to accept employment at a distance from his home," and that " * * * it is for the Board to determine whether, under the evidence, the location is a factor which may be reasonably taken into account." Id., p. 181. Our conclusion was that in each case, whether an employee acted reasonably or not in accepting, rejecting, or seeking a particular employment, was a question of fact.

Under the evidence we have recited, the Board's conclusion that Johnson was not unreasonable in refusing the job offer is fully supported by the record considered as a whole. Whether Johnson's suspicions about the motive for his employment because of the source from which the offer originated was a permissible inference, we need not decide. We do conclude that the necessity of selling his home, removing his child from school, and abandoning the community of which he and his wife were natives, was a sufficient basis on which the Board could determine that his refusal was not unreasonable.

—WILFUL LOSS OF EARNINGS BY ALL EMPLOYEES—

Our examination of the record as a whole satisfies us that the examiner's decision, adopted in essential respects by the Board, correctly and succinctly summarized the evidence on which petitioner relies to establish that all of the employees wilfully refused other available employment and thus forfeited their right to back pay. The examiner said:

"The testimony of J. J. O'Dowd, publisher of the Respondent's Florence Morning News, establishes that the 13 former strikers whose back pay is here involved were either journeymen or apprentices in the typographical trades. All of the 13 strikers were members of the Charging Party and International Typographical Union which limit membership to journeymen and apprentices.

"Mr. O'Dowd's testimony further shows that numerous 'Help Wanted' ads appeared in his daily newspaper during Respondent's liability period advertising for help in occupations unrelated to the typographical trades, such as store and filling station managers and store clerks. The salaries offered for these advertised jobs ranged from about $40 to $65 per 40 hour week as against the $96 per 40 hour week at $2.40 per hour paid by Respondent to its journeymen and $1.25 and upwards paid apprentices in the liability period.

"No showing was made by Respondent that any of the 'want ad' positions advertised in its newspaper were ever personally offered to any of the involved 13 former strikers or that any offers of such positions were ever rejected by any of the 13 former strikers." [8] (footnote added)

The examiner's and the Board's decision on this point thus proceeded from a lack of evidence to show that any employee either sought, or having sought, was refused any job opportunity in the Florence market. Because it asserts that the burden of such proof was on the Board's General Counsel, petitioner con-

8. The Board's supplemental decision discussed this aspect of the case:
   "The Respondent contends that although suitable jobs were available in the area, as indicated by advertisements in its newspapers, the strikers failed to avail themselves of other employment during the liability period. The Respondent failed, however, to show that the strikers did not seek these or other jobs. We agree with the Trial Examiner, therefore, that the Respondent has failed to meet its burden to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability." (citation omitted)

tends that the Board's order in this regard must be set aside.

At the outset, we are met by the counter argument by the Board that this legal issue was not presented to it in accordance with § 10(e) of the Act, 29 U.S.C.A. § 160(e) and that we should not consider it.[9] We have been furnished with a copy of petitioner's exceptions to the examiner's proposed decision and it does not appear that the argument as such was made. Petitioner did, however, except to the examiner's determination "that the failure of strikers to seek or accept jobs from other employers during the period of the Respondent's liability is no defense whatever against payment of the full amount of back wages claimed * * *." Petitioner filed no brief with the examiner, and its discussion of this exception to the Board did not argue in so many words the question of on whom was the burden of proof. However, the significance of an absence of proof is so intertwined with the question of on whom was the burden of proof that we cannot say that § 10(e) of the Act was ignored. Resolving any doubt we may have on this subject in favor of petitioner, we prefer to address ourselves to the merits of the basic question.

Petitioner relies on N.L.R.B. v. Mastro Plastics Corporation, 354 F.2d 170 (2 Cir. 1965), which held that where the issue of wilful loss of earnings is raised by the employer, General Counsel must, as part of the Board's *prima facie* case, present testimony from the employees regarding their search for an interim employment during the liability period.[10] Although the Board argues that the Court's decision in this regard was *sua sponte* without the benefit of briefs by the parties, it has been cited with approval in N.L.R.B. v. Rice Lake Creamery Company, supra, in its holding that an award of back pay to two discriminatees, who did not appear at the enforcement hearing, should be placed in escrow pending their appearance.

Conversely, the Fifth Circuit has refused to follow *Mastro*. In N.L.R.B. v. Mooney Aircraft, Inc., 366 F.2d 809 (5 Cir. 1966), the Court analyzed the Second Circuit's holding and reasoning, saying:

"The Second Circuit's reasoning would lead to the conclusion in this case that the Board should carry the burden of going forward on the issue of interim earnings. Information relevant to establishing the amount of an employee's income during the period of an unlawful discharge is more readily available to the employee than to the employer. On this precise point the *Mastro* decision is in conflict with the Eighth Circuit's decision in NLRB v. Brown & Root, Inc., supra.[11] The Court there held that since interim earnings mitigated the employer's liability as fixed by the Board, the issue

9. Section 10(e) of the Act, in pertinent part, provides: "No objection that has not been urged before the Board, its members, agent or agency, shall be considered by the Court, unless failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Section 10(e) has been given full effect according to its terms in Marshall Field & Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Ochoa Fertilizer Corp., 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); National Labor Relations Board v. Seven-Up Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); N.L.R.B. v. Kotarides Baking Co., 340 F.2d 587 (4 Cir. 1965); N.L.R.B. v. Community Motor Bus Company, 335 F.2d 120 (4 Cir. 1964); and National Labor Relations Board v.

Pugh and Barr, Inc., 194 F.2d 217 (4 Cir. 1952).

10. In *Mastro* the Board's order required the back pay award to claimants to be placed in escrow until the employer had a reasonable opportunity to examine them. When one of the employees did not come forward to testify, the Board nevertheless ordered his award paid to him. While the Court treated the rule that the burden of proving matters of defense, such as wilful failure to accept employment, rested on the employer as established by law, it, nevertheless, held the burden of going forward with evidence to combat the defense rested on General Counsel. It, therefore, refused to enforce the part of the order requiring direct payment.

11. 311 F.2d 447 (8 Cir. 1963).

was an affirmative defense and the Board's failure to produce the employees' testimony was not fatal to its case.

"We think that the Board need not produce the testimony of each and every employee. First, we are not entirely convinced that the employees' knowledge about their efforts to find interim work and the financial success they encountered can realistically be imputed to the Board. More important, to require the Board to call every employee in every case would place an intolerable burden on the agency, particularly where large numbers of employees were involved and there was little basis to dispute the Board's calculations. A better rule would leave the burden on the employer, who could produce the employees' testimony whenever necessary to dispute the Board's figures, but who certainly would not find it necessary to call every employee involved. We conclude, however, that the employer should be given every opportunity to call the employees to testify on the issue of their interim earnings, and that upon the employer's request, the Board should make available any information in its possession relevant to the whereabouts of the employees. When the Board calls an employee, it must, of course, permit the employer to cross examine him on any relevant matter. NLRB v. Miami Coca-Cola Bottling Co., supra. (5 Cir., 360 F.2d 569)" (original footnotes omitted; footnote 11 supplied) Id., pp. 813–814.

 We are persuaded that *Mooney Aircraft* expresses the correct view and that we should follow it. As it, *Mastro*, N.L.R.B. v. Miami Coca-Cola Bottling Company, 360 F.2d 569 (5 Cir. 1966), N.L.R.B. v. Ellis and Watts Products, Inc., 344 F.2d 67 (6 Cir. 1965), Nabors v. N.L.R.B., 323 F.2d 686 (5 Cir. 1963), cert. den., 376 U.S. 911, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964), N.L.R.B. v. Brown & Root, Inc., 311 F.2d 447 (8 Cir. 1963), and National Labor Relations Board v. J. G. Boswell Co., 136 F.2d 585 (9 Cir. 1943), conclusively demonstrate, the defense of wilful loss of earnings is an affirmative defense and the burden of proving it rests on the employer. To say that the opponent of one who has the burden of proof, nevertheless, has the burden of producing evidence for his adversary is in reality to shift the burden of proof. This we are unwilling to do in light of overwhelming authority that the burden of proof rests on the employer. With the Fifth Circuit, we agree that the employer should have every opportunity to interrogate employees, under oath, and to obtain the Board's information of their whereabouts. We would add that the employer, upon application therefor before the examiner, should have full discovery of information in the possession of General Counsel indicating any interim earnings, although we assume that where interim earnings are known, General Counsel would disclose them as part of his case.

In this case, the record shows that many of the affected employees were present at the hearing before the examiner. Indeed, it was necessary to excuse most of them so that petitioner's daily newspaper deadline could be met. At no time did petitioner, through its counsel, evince any desire to examine any employee, except Bass and Johnson, as to interim earnings. Each of the other employees had been reinstated by petitioner prior to the hearing before the examiner, so that petitioner was well aware of the whereabouts of those not present at the hearing.

 Under the law as we perceive it, and the circumstances we have stated, we find no merit in petitioner's contention. We conclude that the Board's determination that there was not wilful failure on the part of employees to accept other employment is supported by the record as a whole, as is the Board's determination of the amount of back pay award to each employee.

Order enforced.

BOREMAN, Circuit Judge (concurring in part and dissenting in part):

I join in the decision to reject the contention of the company that strike benefits provided by the Union's trust fund should be set off against an award of back pay to the strikers. I concur also in the disposition of the issue discussed under the heading "CLAIMED FORFEITURE BY GLENN JOHNSON." I agree that it would be unreasonable to hold that Johnson was required to travel a distance of 100 miles from Florence to Rock Hill to accept employment, even on a temporary basis, in mitigation of loss of earnings.

My principal concern is with respect to that portion of the majority opinion headed "WILFUL LOSS OF EARNINGS BY ALL EMPLOYEES" and the majority decision on the merits of the basic question there discussed. I conclude that detailed discussion of the evidence by me in noting disagreement would avail nothing.

The company's primary contention, as I understand it, is that the Examiner and the Board ignored and failed to give any consideration to evidence tending to show a glaring display of disinterest on the part of the strikers in securing temporary employment, a disinterest sanctioned and encouraged, if not actually prompted and directed, by the Union; also evidence tending to show the intent of the strikers to disregard their legal obligation to minimize their losses of earnings. The majority opinion recognizes the generally accepted rule that a striking employee's loss of wages should be reduced by earnings which he has obtained or *wilfully refused to obtain*.

By way of summarization, there was at least some evidence which would show the following:

1. Without any explanation the Union elected to base the amount of strike benefits on a percentage of the wage scale then prevailing in Columbia, South Carolina, which was higher than the wage scale to which the strikers were accustomed and which was in effect in the Florence area;

2. The Union invoked its rule that if a striker worked at interim employment more than one eight-hour shift in one work week his weekly strike benefits would be subject to drastic curtailment;

3. All or some of the strikers had registered with the South Carolina Unemployment Security Office and represented themselves as available *only for the same type of work in which they had been regularly engaged*, thus insuring a distinct limitation of job availability and opportunity;

4. There was work available in the Florence area as shown by newspaper advertisements of jobs such as store clerks, service station managers and attendants;

5. One or more of the strikers was or were under explicit orders from the Union to accept no steady employment;

6. Certain of the employees did actually work as much as one eight-hour shift out of each week in jobs quite comparable to their regular employment and their right to receive full strike benefits was not thereby affected;

7. All strikers, unless ill or otherwise unavailable, were required to report daily to the picket line.

The majority opinion quotes from the decision of the Examiner and, in footnote 8, from the Board's supplemental decision, and directs attention to the fact that both decisions "proceeded from a lack of evidence to show that any employee either sought, or having sought, was refused any job opportunity in the Florence market." The majority apparently would uphold the Board in imposing a burden on the employer which, in my opinion, would be impossible of performance except in rare instances and under extraordinary circumstances.

The majority would reject the decision of the Second Circuit in N. L. R. B. v. Mastro Plastics Corporation, 354 F.2d 170 (1965), to the effect that where the issue of wilful loss of earnings is raised by the employer General Counsel must, as part of the Board's *prima facie* case, present testimony from the employees regarding their search for interim employment during the liability period.

*Mastro* was cited with approval by the District of Columbia Circuit in N. L. R. B. v. Rice Lake Creamery Co., 112 U.S. App.D.C. 323, 365 F.2d 888 (1966). Instead, my brothers adopt as controlling here the Fifth Circuit decision in N. L. R. B. v. Mooney Aircraft, Inc., 366 F. 2d 809 (1966), with all its implications. I prefer to follow what I believe to be the rule as established by earlier decisions of this court and to apply it in the light of the facts and circumstances as here disclosed by the evidence.

In the case before us there was evidence of employment opportunities in the Florence area indicating a ready labor market. Prospective employers were resorting to newspaper advertising in their efforts to obtain help. The advertised jobs were neither dangerous nor degrading. True, they were not in the same line of work as that in which the strikers had been engaged but this court has long since rejected the idea that strikers or wrongfully discharged employees can sit idly by and ignore job opportunities which are not comparable in all respects with their regular employment and then claim that they had met their obligation to minimize their loss of earnings. Mooresville Cotton Mills v. National Labor R. Board, 5 Cir., 110 F.2d 179 (1940), was decided by this court in an entirely different context. There involved was the question whether certain striking employees were entitled to reinstatement which had been refused on the ground that they had obtained other "regular and substantially similar employment" and had thereby lost their former status of employees with right to reinstatement. Naturally, consideration was given to the question whether other kinds of work were equivalent to the work in which they had been regularly engaged. As the majority opinion in the instant case points out, this court held that a wrongfully discharged employee cannot recover damages for losses which, *in the exercise of due diligence,* he could have avoided. In context, it was logical to conclude that he should not be required to accept equivalent employment which would tend to destroy his employee status and, consequently, his right to be returned to his former position.

But consider and compare this court's decision in N. L. R. B. v. Moss Planing Mill Co., 4 Cir., 224 F.2d 702 (1955), in which it was held that mill employees were required to accept available agricultural jobs, working in tobacco fields, in order to minimize their loss of earnings. In that case the Examiner had found only that an employee did not have to accept an agricultural job because it was manifestly not equivalent to the position the employee had held. The court said, page 705, "And we are convinced, from a study of the record, that Wynne could readily have earned, *had he made reasonable efforts to obtain suitable employment,* much more than the utterly insignificant sum found by the Board." (Emphasis added.) This court disagreed with the Board's conclusion that an employee was not obligated to seek and accept agricultural employment which was not equivalent to his regular employment and held that the amount awarded by the Board must be reduced by a sum equal to what he would have earned *had he made a reasonable effort to secure employment of a nature which he was obligated to seek and accept.*

Consider and compare also the decision of this court in N. L. R. B. v. Pugh & Barr, Inc., 207 F.2d 409 (1953). At page 410 of 207 F.2d the court said:

"The Board seems to have reached the conclusion that it did on the basis that Bramer, having registered with the state unemployment agency, was not bound to make any further showing of diligence. *We do not think that this is sufficient.* The awarding of so large a sum as back pay without the finding of special circumstances justifying it cannot be sustained. We shall accordingly set aside the Board's order and remand the case to the Board with direction that it make specific findings of fact with respect to the matter and award to Bramer no more than the difference between what he could have earned by working for re-

spondent if he had not been wrongfully discharged and what he could have earned elsewhere *if he had used due diligence to secure other employment.*" (Emphasis supplied.)

Implicit in that case is the holding that it was up to the employee (or General Counsel) to make a showing of due diligence to obtain other employment.

In the instant case there was evidence as shown above that strikers had registered with the South Carolina Unemployment Security Office but represented themselves as available for work only of the same type in which they had been engaged. The Union had fixed the unemployment benefits based on a higher wage scale than that prevailing in the Florence area. Without some explanation, it is not illogical to conclude that the higher wage scale was selected so that the strikers' benefits might be increased and thus provide a more nearly adequate allowance to meet living expenses during the strike. Some of the strikers permissibly worked one full eight-hour shift in certain work weeks to supplement their income but by so doing their strike benefits were not curtailed.

The Examiner and the Board would require the company to show that no jobs were ever personally *offered* to any of the strikers or that offers of such jobs were ever *rejected* by any of the strikers. It is my impression that this goes far beyond what this court has ever required or sanctioned. It is my conclusion that the company made out a *prima facie* case by showing the circumstances of registration with the unemployment agency, availability of acceptable jobs in the area and the other facts and circumstances which provide strong support for the inference that the Union was offering every inducement to these strikers to accept no jobs and to refrain from seeking interim employment the earnings from which would mitigate their loss of wages. The company satisfied the only reasonable burden which should be imposed upon it under the circumstances by making a *prima facie* showing of lack of due diligence on the part of the reinstated strikers to minimize their losses of earnings during the liability period. It should then be the duty and burden of the General Counsel to show what unsuccessful efforts had been made by the strikers to secure interim employment, whether comparable or otherwise. There was nothing offered to rebut the *prima facie* case. I would remand the case to the Board for further exploration and consideration of these matters and for this reason I respectfully offer this note of dissent.