NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The MADISON COURIER, INC.,
Respondent.

No. 24808.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 5, 1974.

Decided Oct. 11, 1974.

Allen H. Feldman, Atty., N. L. R. B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert A. Giannasi, Asst. Gen. Counsel, N. L. R. B., were on the brief for petitioner. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., at the time the record was filed, also entered an appearance for petitioner.

Herbert C. Snyder, Jr., Indianapolis, Ind., for respondent.

Before LEVENTHAL, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

The National Labor Relations Board (the Board) petitions under the National Labor Relations Act, as amended,[1] (the Act) for enforcement of its Second Supplemental Decision and Order issued March 30, 1973, against The Madison Courier, Inc. (the Company or the Employer). 202 N.L.R.B. No. 115 (1973). The order directs the Employer to pay back pay in certain specified sums to

1. 29 U.S.C. § 151 et seq. (1970) (49 Stat. 449, 61 Stat. 136, 73 Stat. 519). We have jurisdiction under Section 10(e) and (f) of the Act. 29 U.S.C. § 160(e), (f) (1970).

members of Local 10, International Typographical Union, AFL–CIO (the Union) who engaged in an unfair labor practice strike against the Employer.

The labor dispute in this case has generated two previous proceedings in this court. On January 4, 1967, the Board issued an order finding that the Employer had committed unfair labor practices in violation of sections 8(a)(1) and (5) of the Act and that these violations had caused the unfair labor practice strike. 162 N.L.R.B. 550 (1967). The order directed the Employer to reinstate the strikers and to make them whole for any loss of earnings resulting from its failure to so reinstate. On December 26, 1967, we enforced the Board's order in full. Louisville Typographical Union No. 10, International Typographical Union, AFL–CIO v. NLRB, 57 L.C. ¶ 12,647, 67 L.R.R.M. 2462 (D.C.Cir. 1967).

Early in 1969, Trial Examiner Benjamin Blackburn conducted a hearing to determine the Employer's proper back pay obligation to the claimants. As a principal defense in that proceeding, the Employer contended that the claimants were not entitled to back pay due to their alleged failure to make reasonable efforts to obtain appropriate interim employment. The Trial Examiner's decision rejected this defense and found that 13 claimants were entitled to back pay. On January 16, 1970, the Board issued a Supplemental Decision and Order which completely adopted the findings, conclusions and recommendations of the Trial Examiner. 180 N.L.R.B. 781 (1970). When the Employer refused to pay the back pay sums, the Board sought enforcement in this court. Finding that the Board had incorrectly interpreted and applied the mitigation doctrine and that the Board had failed to explain adequately the reasons for its Supplemental Decision, we refused enforcement and remanded the case to the Board. NLRB v. Madison Courier, Inc., 153 U.S.App.D.C. 232, 472 F.2d 1307 (1972).

On April 5, 1973, the Board issued its Second Supplemental Decision and Order which affirmed the back pay award as to ten of the original 13 claimants but denied back pay to three claimants on the ground that they had failed to make reasonable efforts to locate suitable interim employment. 202 N.L.R.B. No. 115 (1973). The instant enforcement proceeding results from the Employer's refusal to comply with this back pay award. The only issue before the court is whether the ten claimants who were awarded back pay made reasonably diligent efforts to locate suitable interim employment. Finding no substantial evidence on the record considered as a whole to support the Board's Second Supplemental Decision and Order, we refuse enforcement and remand the case to the Board for further proceedings consistent with this opinion.

I

On April 2, 1965, the printers at *The Madison Courier*, a newspaper in Madison, Indiana, instituted a strike in protest of alleged unfair labor practices by the Employer. On July 7, 1966, Trial Examiner William Scharnikow issued his decision, ultimately adopted by the Board, finding that the Employer had committed certain unfair labor practices and directing the Employer to reinstate the strikers and to make them whole for any loss of earnings resulting from failure to so reinstate. Two weeks later, on July 22, 1966, the Employer received a letter signed by the strikers in which they unconditionally applied for reinstatement. The Employer did not respond to this letter and the employees continued to picket the Company's plant daily and to engage in other activities usually associated with a strike. These activities continued until January 1968 when, pursuant to our decree enforcing the Board's order of reinstatement, the Employer offered reinstatement to the claimants.

The 18-month back pay period began on July 22, 1966, when the Employer

refused to reinstate the claimants, and ended in January 1968 when reinstatement was offered. The Board computed the back pay liability by calendar quarter, deducting each claimant's interim earnings (less transportation expenses, if any) from the gross back pay due. The Board awarded back pay to 13 claimants in the following amounts:

| | |
|---|---|
| David R. Ashby | $7,726.18 |
| Bernard A. Corbin | $7,035.61 |
| Albert Lee Dowell | $1,313.70 |
| Walter W. Dowell | $932.50 |
| Paula B. Feltner | $4,617.10 |
| Louis D. Giltner | $5,468.41 |
| Rudolph D. Juett | $8,365.35 |
| Virginia F. Kerr | $7,815.64 |
| Henry Lorenz, Jr. | $8,418.66 |
| August Mead | $4,355.50 |
| Judith A. Moore | $4,735.06 |
| James H. Nichols | $6,112.36 |
| Micky D. Storie | $6,923.76 |

180 N.L.R.B. at 795.

Reviewing this back pay award in NLRB v. Madison Courier, Inc., 153 U.S.App.D.C. 232, 472 F.2d 1307 (1972), we explained at length the mitigation doctrine applicable to this case. Included in the Board's remedial arsenal where an unfair labor practice has been committed is the power to order reinstatement with back pay. 29 U.S.C. § 160(c) (1970). However, a striker is not necessarily entitled to remain idle during the strike and await reimbursement by the employer for lost earnings. To advance "the healthy policy of promoting production and employment," a striker must make a reasonably diligent search for suitable interim employment and must accept such employment if offered. See Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 199–200, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); J. H. Rutter Rex Mfg. Co. v. NLRB, 473 F.2d 223, 241 (5th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); NLRB v. Madison Courier, Inc., supra, 153 U.S.App.D.C. at 242–244, 472 F.2d at 1317–1319; NLRB v. Mastro Plastics Corp., 354 F.2d 170, 174 n. 3 (2d Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.

Ed.2d 682 (1966). In addition to promoting production and employment, interim employment provides independent support for striking workers and thus enables them to conduct their labor dispute with less financial hardship. To the extent the employer proves that the employee breached his duty to mitigate losses, the back pay liability may be reduced.

What constitutes "suitable" interim employment depends on the individual's background and experience as well as on the wages and working conditions of the interim job as compared with the employee's regular job. NLRB v. Madison Courier, Inc., supra, 153 U.S.App.D.C. at 243, 472 F.2d at 1318. The employee need not search for or accept employment which is "'dangerous, distasteful or essentially different' from his regular job" or which is unreasonably distant from his home. Id. at 244, 472 F.2d at 1319, quoting Florence Printing Co. v. NLRB, 376 F.2d 216, 221 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967).

Our previous Madison Courier opinion described a "possible corollary" to the mitigation rule, the so-called "lower sights" doctrine. Under this doctrine, after being unable over a reasonable time to locate the kind of employment to which he is accustomed, an employee whose family is suffering the financial strain of unemployment should "lower his sights" and consider accepting other suitable employment even at a lower rate of pay than his regular job. NLRB v. Madison Courier, Inc., supra, 153 U.S.App.D.C. at 245–246, 472 F.2d at 1320–1321; NLRB v. Southern Silk Mills, Inc., 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957); NLRB v. Moss Planing Mill Co., 224 F.2d 702 (4th Cir. 1955). We pointed out, however, that. even under the "lower sights" doctrine, the employee need not accept employment which is not consonant with his particular skills, background and experience, or which involves conditions that are substantially more onerous than his

previous position. 153 U.S.App.D.C. at 245–246, 472 F.2d at 1320–1321. As will become apparent, this case does not directly involve the "lower sights" doctrine because the Madison, Indiana, area encompassed numerous employment opportunities at the same or higher wages than the claimants' regular jobs. The central issue is whether any of these jobs were "suitable" for particular claimants. The "lower sights" doctrine is relevant here insofar as it is analogous to the approach we take in Section IV, *infra,* where we hold that for a reasonable time the claimants were entitled to confine their search to jobs in the printing industry in which they were primarily skilled and would have preferred to work.

We refused to enforce the Board's first back pay award because the Board had misapplied the mitigation doctrine to the record in this case and had provided an inadequate and partially inconsistent explanation of its reasoning. Particularly, we pointed out the error in the Board's treatment of the printers as a class, rather than as individuals, in determining whether any jobs outside the printing industry would have been suitable interim employment. We were also troubled by the Board's conclusion that registration with the state employment service and reliance on the union "grapevine" constituted diligent efforts to obtain employment when the majority of claimants made no independent application for printing work.

In its Second Supplemental Decision and Order the Board adhered to its fundamental position that the striking printers, as a skilled class, were not required to seek interim employment outside the printing industry. Claimants Feltner and Moore were dropped from the back pay award because they were too inexperienced to be considered skilled printers. The Board also reiterated its earlier position that registration with the state employment service and reliance on the union "grapevine" constituted diligent employment efforts, even for those claimants who made no inde-

pendent application for printing work. Claimant Ashby was dropped from the back pay award because he failed to register and remained unemployed for the entire back pay period.

## II

The initial question is whether interim employment outside the printing industry was per se unsuitable for these claimants as a class. Since we conclude that nonprinting employment was not per se unsuitable, it is necessary to demonstrate that particular jobs would have been appropriate for individual claimants, a task we undertake in Section III. In Section IV we identify the time at which the claimants should have considered employment outside the printing trade. Finally, in Section V we conclude that registration with the state employment service and reliance on the union "grapevine" did not constitute adequate efforts to locate employment in the printing industry.

Our previous opinion noted that nonprinting work was available in the Madison area which was comparable in both working conditions and wages to the claimants' regular jobs. 153 U.S.App. D.C. at 248, 472 F.2d at 1323. Indeed, the Trial Examiner made the following finding which was wholly adopted by the Board:

[T]here were numerous jobs outside the printing trade available in the Madison area during the backpay period which were comparable to, but not identical with, the jobs held by the claimants at the Madison Courier prior to the strike with respect to wages, hours, and other conditions of employment, as well as the amount of physical effort required to perform them and the degree of personal satisfaction and status in the community they afforded to their holders. Each of the claimants might have been hired to fill one or more of these jobs if they had elected actively to seek work outside the printing trade rather than to continue picketing and engaging in other strike-related activities

during the backpay period, regardless of whether the individual claimant was a man or a woman, an older person or a younger person.

180 N.L.R.B. at 786. Despite this finding, the Board concluded that all non-printing jobs were unsuitable for the entire class of skilled printers. We described this conclusion as "clear error" and admonished the Board to consider on remand "whether *particular* claimants should be denied back pay due to their failure to seek such available non-printing jobs." 153 U.S.App.D.C. at 248, 472 F.2d at 1323 (emphasis in original).[2]

In its Second Supplemental Decision and Order, the Board reiterated its conclusion that non-printing work was unsuitable for the entire class of skilled printers. The Board based its decision on the ground that such a holding would force a skilled printer to "abandon his chosen craft" while reducing the employer's liability for an unfair labor practice. Such an abandonment, according to the Board, would prejudice a printer's skills and hinder his reentry into the printing trade.

We find the Board's reasoning wholly unconvincing. Under the decisions cited in Section I, *supra,* an unfair labor practice is remedied when the practice is terminated and the employees are reinstated and made whole for any losses not willfully incurred. The question here is whether the losses were willfully incurred. This question in turn depends on whether public policy is best served by encouraging a skilled and healthy worker to remain idly unemployed for 18 months, or by encouraging him to obtain a job, comparable to his regular job in working conditions and wages, for the duration of the strike period. The Supreme Court has indicated that such policy questions should be resolved in favor of the "healthy policy of promoting production and employment." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 200, 61 S.Ct. 845, 855 (1941).

Other courts have similarly required striking workers to accept interim jobs in a different line of work where the interim work was comparable to the striker's chosen craft and suitable to his background and experience. For example, in NLRB v. Moss Planing Mill Co., 224 F.2d 702 (4th Cir. 1955), the court held that a semi-skilled worker in a lumber mill should have accepted interim agricultural work in view of his prior experience as a farm worker and the high wages paid for farm work in his area. In NLRB v. Southern Silk Mills, Inc., 242 F.2d 697 (6th Cir.), cert. denied, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed. 2d 37 (1957), the court concluded that after a fruitless seven-month search for employment in their trade, striking textile knitters should have sought other jobs for which they were qualified.

The decision in Florence Printing Co. v. NLRB, 376 F.2d 216, 221 (4th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967), is not to the contrary. There the court held that the employer failed to carry its burden of demonstrating that the striking journeymen and apprentices in the typographical trade had willfully refused other available employment. Not only were the salaries for the other employment considerably less than the strikers' prior salaries, but the employer also failed to show that the strikers had not in fact sought the available jobs. *Id.* 376 F.2d at 221 & n. 8. Thus, the *Florence Printing* decision rests on a failure of proof and not on any policy decision that striking printers as a class need not seek comparable interim employment outside the printing industry.

2. We also stated:
Such a disposition clearly violated the recognized principle of *treating each particular claimant separately* in determining his right to back pay, and it may well have led the Board to erroneously conclude that the claimants only had the duty of seeking other comparable *printing industry* employment.
153 U.S.App.D.C. at 247–248, 472 F.2d at 1322–1323 (footnote omitted, emphasis in original).

By accepting interim non-printing employment, a printer neither abandons his chosen trade nor prejudices his craft skills. Temporary employment during a strike to avoid continued idleness certainly cannot be considered abandonment of one's trade, and an individual's skills are prejudiced no more by performing non-printing work than by remaining unemployed for an extended period. Moreover, in the present case a prior Board order required the Employer to reinstate the strikers and to provide adequate on-the-job retraining for those not reinstated to their exact prior positions. Strikers were thus protected from any loss of craft skills.

■ Counsel for the Board attempts to find support for the Board's position in common law decisions regarding mitigation of damages where an employer breaches a contract by discharging an employee. See generally Annot., 44 A. L.R.3d 629 (1972). Of course, common law contract decisions are not directly applicable to this statutory area of federal labor law because federal labor law is imbued with a special sense of public policy. Unlike the common law doctrine, the mitigation doctrine with which we are presently concerned is designed primarily to further "the healthy policy of promoting production and employment," and only secondarily to remedy individual economic loss and prevent unfair windfalls. See Phelps Dodge Corp. v. NLRB, *supra,* 313 U.S. at 199–200, 61 S.Ct. 845; NLRB v. Madison Courier, Inc., *supra,* 153 U.S.App.D.C. at 242, 472 F.2d at 1317. In any event, not all common law decisions hold that *every* job outside an employee's craft would be unsuitable for mitigation purposes. For example, in Tenzer v. Gilmore, 114 Mo. App. 210, 89 S.W. 341 (1905), cited by counsel for the Board as the majority view, the court held that discharged tailors were not required to accept positions "as cooks or domestic servants, or engage in other occupations *uncongenial* to them." 89 S.W. at 342 (emphasis added).

Our decision does not require striking employees to accept interim employment which is "uncongenial" to them. We hold only that a striking printer may not cavalierly ignore the existence of non-printing work which is no more dangerous or distasteful or essentially different from his regular job and which is suitable to his background and experience.

### III

■ The record in this case demonstrates that non-printing work existed in the Madison area which was suitable to the background and experience of many of the claimants. Ordinarily we would leave to the Board the task of correlating the backgrounds of individual claimants with the requirements of particular non-printing jobs. However, the Board has twice refused to do this, insisting instead on treating the entire group as a single class. In our previous opinion we emphasized:

> Despite the varied backgrounds and experiences of these particular claimants, the N.L.R.B. failed to consider whether they made adequate efforts to locate comparable *non-printing* work commensurate with their respective employment histories.

> \* \* \* \* \* \*

> [T]he N.L.R.B. dismissed the failure of the claimants to seek such available non-printing positions as may have been commensurate with particular claimants' background and experience, by deciding that the *entire group* only had to seek printing industry positions. This clear error must be rectified on remand, by the thorough consideration of whether *particular* claimants should be denied back pay due to their failure to seek such available non-printing jobs.

153 U.S.App.D.C. at 248, 472 F.2d at 1323 (emphasis in original). In the face of the Board's repeated refusal to consider the suitability of non-printing jobs for particular claimants, we are

obliged to undertake this task ourselves. Contrary to the position taken by the dissent, this court does have the authority to make the necessary determinations where the Board has been given the opportunity to correct its order but refused to do so.[3]

Claimant Corbin, 25 years old at the time of the strike, was married and had one child. During the 18-month back pay period, Mr. Corbin earned only $77.-23 as compared to his gross back pay figure of $7,856.95. He had worked for the Company for nine years since his graduation from high school and was a linotype operator at the time of the strike, earning $2.38 per hour. Mr. Corbin turned down an offer for employment as a full-time grocery clerk "due to the fact that it would have conflicted with his picketing duties." Supp.App. at 8. Although the grocery clerk job would have paid only $1.25 per hour, Mr. Corbin had chosen to apply for this job on a part-time basis, which was refused. His only employment during the 18-month back pay period was a temporary one-day-per-week job at the *Trimble Democrat and Banner,* 10 miles from Madison, which he held for four quarters.

Claimant Kerr was 37 at the time of the strike. During the 18-month back pay period, she earned $677.21 as compared to $8,587.89 in gross back pay. Mrs. Kerr was a high school graduate who had worked in the printing industry all her life and had been a linotype operator for the Company for four years prior to the strike, earning $2.50 per hour. During the back pay period Mrs. Kerr made no independent application for employment either in or out of the

printing trade. However, a publisher of the *Trimble Democrat and Banner,* 10 miles from Madison, called Mrs. Kerr and offered her a job for three days per week. Mrs. Kerr thereafter worked one day per week for approximately five quarters, sharing the part-time job with claimants Nichols, Corbin and Lorenz.

Claimant Nichols was 42 at the time of the strike. During the 18-month back pay period, he earned $2,140.75 as compared to $8,253.11 in gross back pay. Mr. Nichols, a high school graduate, had been with the Company for 11 years and was a linotype operator at the time of the strike, earning $2.50 per hour. Previously, he served two years in the military and worked for 18 months as a civilian gunner at the Jefferson Proving Ground. During the back pay period Mr. Nichols, who was married and had three young children, made no personal application for work anywhere. However, sharing Mrs. Kerr's job at the *Trimble Democrat and Banner,* Mr. Nichols worked one day per week for four quarters. Later in the back pay period, while Mr. Nichols was on the picket line, he was approached by the editor of the *Gallatin County News* who was looking for a linotype operator. Thereafter, for two quarters, Mr. Nichols worked two days per week at the *Gallatin County News,* located 35 miles from Madison.

Claimants Corbin, Kerr and Nichols were linotype operators at the time of the strike earning $2.38 to $2.50 per hour. The linotype operator's job was described by Mrs. Kerr as a sometimes dirty job which occasionally involved some heavy lifting, which involved some risk of being squirted with molten lead, and in which the operator was required

3. N.L.R.B. v. Food Store Employees Union, Local 347, etc., 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974) does not prevent this court from pursuing the course of action which we adopt in this case. The Supreme Court held "it was 'incompatible with the orderly function of the process of judicial review,' . . . for the Court of Appeals to enlarge the [Board] order without first affording the Board an opportunity to clarify the inconsistencies." *Id.* at 9, 94 S.Ct. at 2079. In the present case, our previous remand to the Board gave it ample notice and opportunity to modify its position and make the determinations necessary to correlate the backgrounds of the strikers with the requirements of available non-printing jobs but the Board refused to do so. Thus it is unnecessary to afford the Board an additional opportunity to consider the individual cases. *See id.* at 10, n. 10, 94 S.Ct. at 2080.

to perform some minor maintenance work on the machine. If only they had applied, claimants Corbin, Kerr and Nichols might have been hired for any one of the non-printing jobs in the Madison area which paid as much as or more than they had been earning. During the back pay period Dow Corning Corporation, located 17 miles from Madison, hired 76 new employees for engineering, clerical, production and maintenance work at $2.50 to $3.00 per hour. American Can Company, located 25 miles from Madison, hired 155 new employees at $2.65 to $2.72 per hour for production work in manufacturing tin cans. Olin-Mathieson Chemical Corporation, located 32 miles from Madison, hired 13,679 new employees at $2.50 to $3.00 per hour for warehouse, guard, clerical, and technical and production work in the manufacture of ammunition charges.

In one month during the back pay period, Dow Corning hired 12 employees in the Class A Operator classification at a median starting wage of just under $3.-00 per hour. The Class A Operator job involved monitoring and controlling the chemical process at a large instrument board. The only qualifications required for the Class A Operator job were a high school education or the equivalent and physical fitness. All that employees needed to know was taught by the employer on the job. This high paying, clean-hands job in a new plant involving the use of a comparably high level of technical skill would certainly have been suitable interim employment for the linotype operators, Corbin, Kerr and Nichols.

Additionally, Mr. Nichols had worked for 18 months as a civilian gunner at the Jefferson Proving Ground. During the back pay period the Jefferson Proving Ground, located six miles from Madison, hired nine civilian gunners at hourly wages of $2.91 to $3.21. In view of Mr. Nichols' prior experience, this higher paying job would have been suitable interim employment, if only he had applied.

Claimant Giltner was 26 years old at the time of the strike and was in fine physical condition throughout the back pay period. Mr. Giltner, who was married and had three children, earned $1,750.11 during the 18-month back pay period as compared to $7,218.44 in gross back pay. He grew up on a farm and at the time of the strike lived on a farm about 20 miles outside Madison. After graduating from high school, he worked for two years for a farm implement dealer delivering machinery and for a poultry processing plant where he operated a machine. For six years prior to the strike he worked for the Company as a pressman and as a stereotyper, earning $2.16 per hour. His duties included carrying metal into the foundry, melting it, pouring it, casting lead plates and affixing the plates to the press. There was ink and grease in the pressroom and Mr. Giltner described his job as hot and dirty. Mr. Giltner's only independent application during the back pay period was for a part-time job as a stockboy in a grocery store. He worked in that capacity for 21 hours per week during the back pay period. Although Mr. Giltner's testimony does not reveal his wages as a stockboy, it appears from his earnings statement that he received hourly wages of about $1.25.

No reason is given for Mr. Giltner's failure to apply for the more attractive jobs available at Dow Corning, American Can or Olin-Mathieson, described above. The production jobs at American Can, which paid starting wages of $2.65 to $2.73 per hour, involved feeding pieces of sheet metal into machines which formed and sealed the tin cans and operating a device which tested the integrity of the seal. This job, paying a substantially higher wage than stockboy or pressman wages, would have been suitable interim employment for a pressman whose hot and dirty job involved carrying, melting and pouring metal. Yet Mr. Giltner did not even apply for this job.

Claimant Storie, about 25 years old at the time of the strike, was married and

had one child. During the 18-month back pay period, Mr. Storie earned $1,764.83 as compared to his gross back pay of $8,688.59. Mr. Storie graduated from high school and worked for some time as an automobile mechanic at a new car dealership and at a service station. He had worked for the Company for seven years and at the time of the strike was a makeup man, earning $2.50 per hour. Mr. Storie described his job as a heavy, dirty job, involving the handling of galleys of type, lead slugs and some heavy composing room equipment. After the strike began, but prior to the back pay period, Mr. Storie made two applications for part-time work as a mechanic. He accepted a part-time job as a mechanic at a motorcycle dealer where he worked throughout the back pay period, earning $20 to $30 per week.

Mr. Storie never explained why he did not apply for the higher paying jobs at Dow Corning, American Can or Olin-Mathieson, for which he was qualified. Any of these jobs would have been suitable interim employment. Moreover, Mr. Storie's additional experience as a mechanic may have qualified him for several other jobs in the Madison area. During the back pay period the Jefferson Proving Ground hired automotive and other maintenance mechanics at hourly wages of $2.57 to $3.12. Reliance Electric Company, located just outside Madison, manufactures electric motors. During the back pay period Reliance Electric hired 301 new employees as lathe and punch press operators, assemblers and stock handlers at hourly wages of $1.70. Williamson Company, which is engaged in metal work at its manufacturing plant in Madison, hired 96 new employees as shear and press operators, welders and grinders at hourly wages of $1.70 to $1.82. Rex Chain Belt, which manufactures machinery at its plant in Madison, hired about 130 new employees as press and punch operators, helpers and assemblers at hourly wages of $1.73 to $1.80. Mr. Storie specifically testified that he was familiar with the production work performed at Reliance Electric, Williamson and Rex Chain Belt, that several years earlier he had applied for employment at those companies, and that he was capable of performing that kind of work. During the entire strike period, Mr. Storie never applied for employment at any of these companies.

There is no evidence in this case indicating that the claimants did not apply for non-printing jobs because the non-printing employers would not hire strikers or other temporary employees. Indeed, the Board specifically found:

> Each of the claimants might have been hired to fill one or more of these jobs if they had elected actively to seek work outside the printing trade rather than to continue picketing and engaging in other strike-related activities during the backpay period, regardless of whether the individual claimant was a man or a woman, an older person or a younger person.

180 N.L.R.B. at 786. Claimants Corbin, Giltner, Kerr, Nichols and Storie never applied for employment outside the printing trade even though non-printing work existed which was comparable in both wages and working conditions to their regular jobs. Thus, we can only conclude that they failed to make a reasonably diligent search for suitable interim employment outside the printing trade.

Claimants Juett, Lorenz and Mead were all about 60 years old at the time of the strike. Mr. Juett made no independent application for employment during the back pay period and earned no money during that period. His gross back pay was $8,365.35. Mr. Lorenz worked for three days at the *Trimble Democrat and Banner* job which claimants Kerr, Nichols and Corbin shared, and earned $67.50 during the back pay period as compared to $8,486.16 in gross back pay. Mr. Mead earned $417.58 as compared to gross back pay of $4,880.00. Messrs. Juett and Lorenz had worked for the Company for about 40 years as linotype operators, earning $2.50 per hour at the time of the strike. For two

years prior to the strike, Mr. Mead worked part time (apparently an average of three days per week) for the Company as an advertising compositor earning $2.50 per hour. An advertising compositor assembles the components of an advertisement, adds the border lines and prints an initial proof. Mr. Mead also performed similar printing work for other companies in the Madison area. In view of these claimants' ages and long experience in the printing trade, we cannot say that any of the non-printing jobs described in the record would have been suitable interim employment for them.

Claimants Albert Dowell, 27 years old at the time of the strike, and Walter Dowell, 51 years old, obtained full time jobs as of October 1966 at the *Courier Journal* in Louisville, Kentucky, approximately 50 miles from Madison. Walter Dowell also worked part time for a printer in Madison during the first four quarters of the back pay period. As a result, Walter Dowell's earnings for the entire back pay period, less his transportation expenses, were $8,152.79. He received a back pay award of $932.50. Albert Dowell's earnings, less expenses, were $6,930.32 and he received a back pay award of $1,313.70. Albert Dowell had worked for the Company as an advertising compositor since his graduation from high school 11 years before. Walter Dowell had worked for 15 years in the shipping department of a nail factory, but for 19 years preceding the strike he had been an advertising compositor for the Company. Since Albert and Walter Dowell obtained full-time employment within the printing industry, it is unnecessary to consider whether any nonprinting jobs would have been suitable interim employment for them.

## IV

■ Having concluded that claimants Corbin, Giltner, Kerr, Nichols and Storie failed diligently to search for nonprinting jobs which would have been suitable interim employment, we must determine the time at which these claimants should

have sought jobs outside the printing trade. The claimants' duty to mitigate arose in July 1966. For a reasonable period thereafter, the claimants were entitled to confine their search to the printing industry in which they were primarily skilled and would have preferred to work. However, when it became apparent that printing jobs were not available in the Madison area, the claimants should have broadened the scope of their search and sought suitable non-printing employment. See NLRB v. Madison Courier, Inc., *supra,* at 245–246, 472 F.2d at 1320–1321; NLRB v. Southern Silk Mills, Inc., *supra*; NLRB v. Moss Planing Mill Co., *supra.* At that time the right to back pay terminated for those claimants who failed to broaden the scope of their search.

■ At the beginning of the back pay period in July 1966, the claimants had been on strike for over a year. By October 1966 it must have been apparent to the strikers that printing jobs were not available in Madison. The state employment agency informed them from the outset that the agency never had referrals for printing work. The Union had been unable to locate any printing work in the Madison area. Moreover, October 1966 was the time at which the Dowells accepted jobs at the *Louisville Courier Journal,* approximately 50 miles from Madison. The Dowells' acceptance of a job so far from Madison indicates their realization that regular printing work was not available in Madison. Likewise, by October 1966 the other claimants must have realized the futility of obtaining work in Madison in the printing trade and at least should have attempted to locate suitable employment in other fields. Those claimants who did not seek such suitable employment are not entitled to back pay for the period after October 1966.

## V

In addition to their inadequate search for employment outside the printing trade, most of the claimants failed to make adequate efforts to locate work

even within the Madison area printing industry. Although this issue depends on the particular efforts of each claimant, several factors are common to all claimants.

Most of the claimants' efforts to find interim employment were limited to registration with the state employment service and reliance on the union "grapevine." The majority made no individual applications to area printing establishments. In our prior opinion we characterized these efforts as "seemingly inadequate," 153 U.S.App.D.C. at 249, 472 F.2d at 1324, and remanded to the Board for further consideration of the adequacy of the claimants' efforts to locate interim printing employment. In so doing we pointed out that if the registration with the state employment service and reliance on the union "grapevine" were inadequate mitigation efforts, then the Board "would have to conclude that inadequate efforts were made by at least those employees who made no individual efforts to locate other work." *Id.*

On the advice of the Union, most of the claimants registered with the state employment service. Each of the registering strikers indicated that he was seeking employment only in the printing trade. On their first visit to the bureau to register, however, claimants Nichols, Storie, Mead and Albert Dowell were informed that the bureau "never had any jobs in the printing industry." Jt.App. at 364. At no time did the state agency refer any printing jobs to the strikers.

Our prior opinion noted an inconsistency in the Board's reliance on registration as evidencing the diligent efforts of some claimants while the Board excused claimant Ashby's failure to register on the ground that registration was a "futile act." 180 N.L.R.B. at 787; see 153 U.S.App.D.C. at 249, 472 F.2d at 1324. On remand the Board dropped Mr. Ashby from the back pay award, apparently assuming that this action eliminated the inconsistency in its logic. However, we still believe that the Board's heavy emphasis on state registration to evidence diligent employment efforts in this case is inconsistent with its own candid assessment of the registration procedure:

> The claimants were aware of the weight that can be given in backpay proceedings to registering for work with a State employment service. Mindful of this, they carefully sought to protect themselves by going through the formality. As all their stories of what the State official said to them and they said to him on those occasions clearly establish they were complying with form rather than substance. The official told them that they were not serious because they knew that he had no jobs for printers. They replied, as form required, that they would accept any printing job within a reasonable radius of Madison.

180 N.L.R.B. at 787.

Registration with the state employment agency may well be an appropriate factor in assessing a claimant's efforts to locate interim employment. NLRB v. Madison Courier, Inc., *supra,* 153 U.S.App.D.C. at 249, 472 F.2d at 1324; see J. H. Rutter Rex Mfg. Co. v. NLRB, 473 F.2d 223, 242 (5th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); NLRB v. Pugh & Barr, Inc., 207 F.2d 409 (4th Cir. 1953). But under the circumstances of this case, such registration for printing work only is hardly persuasive evidence of a diligent effort to find work. Registration was a mere formality which no one realistically expected to be fruitful.

The other factor which the Board emphasized in finding diligent efforts by all claimants to locate work was their reliance on the union "grapevine." The president of the Union testified that the Union "generally speaking . . . does not go out seeking employment for people, but if the employer needs someone he calls the secretary-treasurer and lets him know." Jt.App. at 75. A Union representative testified that during

the strike he informed other union representatives at a national convention that Madison Courier employees were available for work. Jt.App. at 77–78. The secretary-treasurer of the Local made four inquiries during the back pay period, all to printing establishments located over 50 miles from Madison. He testified that he was not familiar with the shops that do printing work in Madison. Jt.App. at 56. The claimants' reliance on such limited and sporadic employment inquiries by the Union cannot be construed as a diligent employment search by the striking individuals.

The significant factor which overshadows this case is that most of the claimants made no individual applications for employment in the printing trade. There were five weekly publications operating in the Madison area, and the record indicates that the claimants were aware of these publications. Yet no claimant applied for work in any of these establishments.

In an attempt to justify the claimants' failure to apply for work at the weekly publications, the Board points out that one publisher who testified that he "could have put a man on" did not testify that he in fact hired anyone during the back pay period. See Supp.App. at 18. The Board further relies on another publisher's testimony that it is "doubtful" that he could pay wages which a trained person would be willing to accept. *Id.* at 18–19. From this testimony the Board infers a "scarcity of work," reasons that such a scarcity somehow "reflect[s] upon what the standard of diligence should be," and concludes:

> Mindful of the lack of opportunities for employment existing in the printing trade during the backpay period and in the absence of a showing by the Respondent that unfilled jobs comparable to those held by the claimants at the time of the strike actually existed during the backpay period, we conclude that the Respondent has failed to establish that any of the

claimants incurred a willful loss of earnings by not making an inquiry or application for each and every possible job that might have existed within the printing industry.

Supp.App. at 20 (footnote omitted).

The Board's reliance on an alleged scarcity of work ignores the mandate of our previous opinion where we stated:

> [T]he employer is not under the severe burden of establishing that a particular discriminatee *would have* located suitable interim employment had he only made the required effort, before the back pay liability may properly be reduced. "[W]*ith such diligence lacking, the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant.*" American Bottling Co., 116 NLRB 1303, 1307 (1956).

153 U.S.App.D.C. at 244, 472 F.2d at 1319 (footnote omitted; second emphasis added).

We are not saying that the claimants should have applied for "each and every possible job that might have existed," Supp.App. at 20, but only that they should have made reasonably diligent efforts to obtain suitable work. Employment at a weekly printing establishment would have been entirely suitable for these claimants in view of their backgrounds and skills. Moreover, the publishers of two of the weekly publications testified that printing jobs were available during the back pay period. Another publisher actually approached the picket line to recruit a printer for his publication, Jt.App. at 367, and yet another called one of the strikers at home to offer a job. Jt.App. at 138. But none of the claimants made any independent inquiry at these publications.

There is no evidence to suggest that the claimants failed to apply for work at these publications because of a reasonable belief that an application would be futile. If some of the claimants had applied and been turned down for these

printing jobs, the other claimants might have been justified in not pursuing the same or similar jobs. However, since the claimants here never even applied for any of these jobs in the printing trade, we cannot agree with the Board that their efforts to obtain interim printing employment were diligent.

Since claimants Corbin, Juett, Kerr and Nichols made no independent application for printing work during the back pay period, we must conclude that they failed to make a reasonably diligent search for interim employment and are not entitled to back pay. Similarly, claimant Albert Dowell made no independent application for printing work until October 1966 when he accepted a job with the *Louisville Courier*. He is not entitled to back pay for the period preceding October 1966.

The Trial Examiner described claimant Lorenz's efforts to obtain interim printing employment as follows:

> During the backpay period he did his loafing at a job shop in Madison owned by a friend named Chapman. Chapman has one Linotype machine and employs one Linotype operator. Lorenz constantly asked Chapman whether Chapman had any work for him. Chapman never did. To the extent that these casual conversations constitute applications for employment, Lorenz actively sought work in the printing trade in Madison during the backpay period. He applied for work to no other employer, either in or out of the printing trade, either in or out of Madison.

180 N.L.R.B. at 783. On the basis of this finding, which the Board adopted, we cannot say that Mr. Lorenz made a reasonably diligent effort to obtain interim employment, and consequently he is not entitled to back pay.

 During the back pay period, claimants Giltner and Storie both held part-time jobs outside the printing industry at lower wages than their jobs with the Company. The Employer contends that they should be denied back pay because they made inadequate efforts to obtain work which was comparable to their regular jobs. However, as we noted in our prior opinion, there is some danger in withholding back pay from a claimant who accepts a lower-paying job without making a completely adequate search for higher-paying work. If he accepts the lower-paying job too soon, he may be held to have incurred a willful loss of income by accepting an unsuitable position. But if he turns down the lower-paying job, he may be held to have incurred a willful loss of earnings by failing to "lower his sights." Consequently, doubts in this area should be resolved in favor of the claimant. 153 U.S.App.D.C. at 246, 472 F.2d at 1321. Resolving any doubt in favor of the claimants, and mindful of both the immediate financial stress which a striker confronts and the policy of discouraging continued idleness, we conclude that claimants Giltner and Storie did not incur a willful loss of earnings when they accepted the lower-paying part-time jobs. Nevertheless, Messrs. Giltner and Storie were not entitled to settle back into lower paying *part-time* jobs for the entire duration of the back pay period. At least by October 1966, these claimants, like the rest of the claimants, should have realized that neither the Union nor the state employment service could furnish interim printing employment. At that time Messrs. Giltner and Storie should have looked outside the printing industry for full-time employment which was suitable to their backgrounds and skills. By failing to do so, they made inadequate efforts to mitigate their losses. Claimants Giltner and Storie are entitled to back pay up to October 1966, but not thereafter.

Claimant Walter Dowell worked part time at a printing establishment until October 1966 when he obtained a full-time position with the *Louisville Courier*. Resolving any doubts as to his part-time employment in favor of the claimant, we conclude that Mr. Walter Dowell is entitled to back pay for the entire back pay period.

Claimant Mead obtained "occasional work on a casual basis" at two printing

establishments in Madison. 180 N.L.R. B. at 784. However, his earnings from this work were so negligible that they did not appear in the back pay specification. Mr. Mead did not apply for work anywhere else in Madison. Nor did he apply to any of the weekly publications in the Madison area, although he was aware of their existence. On this record we cannot say that Mr. Mead made a reasonable effort to mitigate his losses, and consequently he is not entitled to back pay.

The case is remanded to the National Labor Relations Board for further proceedings consistent with this opinion.

Judgment accordingly.

LEVENTHAL, Circuit Judge (dissenting).

I might well join in the court's opinion if ours were the primary function of implementing the National Labor Relations Act. However, Congress has given the National Labor Relations Board the responsibility of issuing appropriate orders to effectuate the legislative objective. In my view the court's opinion represents an unwarranted intrusion on the agency's functioning.

In its prior mandate the court instructed the Board to consider the claimants individually and the possibility of their "lowering sights." Following the remand there was consideration by the Board, and a lengthy opinion which reflected a different approach from that which we held invalid. There were also differences in result. Apart from the case of Ashby, denied relief because of a failure to register with the state employment service, the Board held that Feltner and Moore had to lower their sights and to go from a teletypesetter job to clerical work at nonprinting sources.

As to the other 10 employees, the Board held that the Company had not carried the burden of proving a willful loss of earnings. In my view this was a reasonable determination, within the Board's discretion and expertise. It took into account the employees' periods of service, skills and ages, and the work available elsewhere.

The Board found that the Company did not show that unfilled jobs in the printing trade actually existed. There was substantial evidence to indicate that a few hirings by other printing employers were only for untrained men to work at a minimum wage. The Board could consider it a fact of life that infuses meaning into a cold record that the printing employers from Versailles and North Vernon who visited Madison did not want men who were on the picket line.

As to the claim that respondent had met its burden by showing that alternative work opportunities were available outside the printing industry, the Board felt, and it had a right to conclude, that it is no light matter to tell men with years of service in the printing industry that they forfeited the relief due them, when they were fired in violation of a law passed for the benefit of both employees and public, because they did not scrap their skill in a specialized trade when they put themselves out for hire.

The Board did not say that printers could refuse to go for work outside the printing industry. It concluded that, after considering the skill, background and experience of each of the claimants the various alternative employments were not suitable for the claimants.* I think this was a matter within the Board's discretion.

The Board surveyed and identified both the various possibilities of alternative non-printing employment, available

---

* The Board found: "To hold otherwise would be to force an experienced member of a specialized trade to abandon his chosen craft in order to diminish the Respondent's liability for its established wrongdoing. Moreover, to force such abandonment would hamper production and employment by causing a discriminatee to prejudice his skills in

a highly complex and constantly changing industry. The resulting loss of proficiency and experience would be an inhibiting factor in obtaining new employment in the printing trade as well as in progressing with any job a striker was already performing before the Respondent's unlawful act."

during the backpay period, and the skill, background and experience of each of the employees. The Board was not required to make a detailed cross-check and analysis, man by man, and job by job. It is not inappropriate for an administrative agency to consider matters like these with some latitude for generalizing.

But if I am wrong in saying that the Board's findings supported its order, I am still right in saying that this court does not have the authority to make a determination for itself that the employees have rejected suitable employment. It is not our function to try to match printing skills with different kinds of factory production jobs, or to say, as respondent claims, that a printer who was the subject of discrimination for union activity nevertheless lost all right to relief because he did not apply to the Army's Jefferson Proving Grounds, where ammunition was tested and fired, to take on work that was outside, unpleasant, and even dangerous—with records of persons killed at work.

I would grant the Board's petition for enforcement of its order.